**WHITEMAN v. BISHOP et al.**    (No. 3300.)

(Court of Civil Appeals of Texas. Texarkana. Dec. 9, 1926.)

**1. Evidence ⬤⟳441(11)—Without fraud, parol evidence is inadmissible to show contemporaneous agreement that note signed by directors and stockholders was intended to be obligation of bank.**

In absence of fraud in securing signatures, parol evidence is not admissible to show contemporaneous agreement that plain and unambiguous note, signed by directors and stockholders of bank, was intended to be obligation of bank and not of signers individually.

**2. Evidence ⬤⟳441(11)—Statute held not to permit parol evidence of contemporaneous agreement varying terms of note after title has passed (Negotiable Instruments Law, § 16).**

Negotiable Instruments Law, § 16 (Vernon's Ann. Civ. St. Supp. 1922, art. 6001—16) authorizing proof that delivery of note was conditional, permits maker to prove conditions under which title was to pass and note become binding obligation, and does not permit proof of contemporaneous parol agreement contradicting or varying plain terms thereof after title has passed.

**3. Bills and notes ⬤⟳103(1)—Bank examiner's refusal to perform parol agreement contemporaneous with signing of note by bank directors and stockholders held not fraud on makers.**

Bank examiner's mere refusal, due to change of mind, to permit carrying out of his oral agreement on which note was signed by directors and stockholders to make good impairment of bank's capital, *held* not fraud of which makers could complain.

**4. Banks and banking ⬤⟳43—Duty of making good impairment of banking corporation's capital is on stockholders (Rev. St. 1911, art. 523).**

Duty of making good deficiency in capital stock of banking corporation, under Rev. St.

---

1911, art. 523, is on stockholders as real owners of corporation.

**5. Bills and notes ☞92(5)—Directors and stockholders signing note for advance to bank to prevent its closing held not mere accommodation makers.**

Directors and stockholders who signed note for money advanced to banking corporation by president to restore its depleted capital to prevent closing of bank by bank examiner were benefited by advance and were not mere accommodation makers.

Appeal from District Court, Red River County; R. J. Williams, Judge.

Action by H. S. Whiteman against Ira Bishop, J. H. Wooley, and others. From so much of a judgment in his favor as denied recovery against defendant Wooley, plaintiff appeals. Judgment so far as appealed from reversed and rendered.

W. F. Moore, of Paris, for appellant.
A. L. Robbins, of Clarksville, for appellee.

HODGES, J. On January 2, 1922, Ira Bishop, Oma Puckett, J. H. Wooley, and L. B. Pool executed and delivered to the appellant, H. S. Whiteman, the following note:

"$3.000.00 Annona, Texas, January 2, 1922.

"January 1st after date I, we or either of us promise to pay to the order of H. S. Whiteman of Annona, Texas, three thousand dollars at the First State Bank, Annona, Texas, for value received, with interest from maturity until paid at the rate of 10 per cent. per annum, payable annually. And if this note is not paid at maturity and is sued on or placed in the hands of an attorney for collection, I, we or either of us promise to pay an additional sum of 10 per cent. on the amount of this note as attorney's fees, having deposited and pledged with said bank as collateral security for the payment of this note sundry notes, which property is pledged at a valuation of $———. * * *

"Ira Bishop.          Oma Pucket.
"J. H. Wooley.        L. B. Pool."

That portion of the note which provided for the sale of the collateral in the event the debt was not paid at maturity is omitted as immaterial. The word "bank" appearing in the body of the note is probably due to the fact that a bank note form was used. The proof shows that all of the parties to the note were stockholders of the First State Bank of Annona, which had a capital stock of $25,000. They were all directors except Wooley, who was the largest stockholder. Whiteman was president, Bishop was vice president, and Pool was the cashier and the managing officer of the bank.

Since the special answers of the defendants are important in determining the issues involved and also furnish a history of the transaction which terminated in the execution of the note sued on, they are here set out in full.

After a general demurrer and a general denial, Puckett and Pool pleaded specially as follows:

"That on said date and at the time of the execution of the note upon which plaintiff bases his cause of action, the board of directors were in session, with plaintiff present and acting as chairman of said meeting; that the other defendants were present, with L. B. Pool acting as secretary of said meeting; that said board meeting was being held in the directors' room of said bank; that there was present, also, at said meeting one —— Kennedy, a state bank examiner, who just finished examining said bank, and who found, after requiring that several notes be 'charged off,' that the capital stock of said bank had been depleted in the sum of $3,000 below the amount required by law for it to continue business; that said bank examiner called on said board of directors to make good said deficiency; that none of said directors had such an amount of money, except the plaintiff, H. S. Whiteman; that said examiner proposed that the plaintiff, H. S. Whiteman, place in said bank to its credit such sum of money and that a note be drawn in favor of said Whiteman for said sum of money and that the directors present sign said note as makers and that good notes belonging to the bank and then in the note case sufficient in number and value be turned over to the said H. S. Whiteman to be collected by him and the proceeds applied to the full payment of the note then and there executed. and such note was to be paid in such manner and not by these defendants as aforesaid; that there were among the assets of said bank and in its note case at that time about $40,000 in good notes owing to said bank by solvent makers; that such plan to raise $3,000 for the use and benefit of said bank, as suggested by said examiner, was approved by all the directors present including the plaintiff; that said examiner drew the note, or had it done, for defendants to sign, and drew a check payable to the bank for plaintiff to sign; that the notes to be turned over to plaintiff were in the note case, which was on the table around which said board of directors was meeting; that defendants Bishop, Pool, and Puckett signed the note to plaintiff, and plaintiffs signed the check payable to the bank, in accordance with the above outlined scheme; that said examiner took the check, and the defendant L. B. Pool suggested that the notes be withdrawn from the note case and turned over to plaintiff, as was agreed upon, and undertook to do so, whereupon said examiner turned over to said Pool the check with instructions to credit the bank with same, and suggested that he, the said bank examiner, would attend to the turning over to plaintiff the notes; that these defendants, except Pool, left the bank and did not know that the plaintiff, Whiteman, had not received the notes, as was agreed, for quite a while thereafter; that later the plaintiff and the defendant Pool took notes from the note case sufficient in number and value to cover the amount of plaintiff's note, and wrote 'H. S. Whiteman' on each of same, whereupon they were informed by said bank examiner that he would close the bank if said notes were turned over to the plaintiff, according to the agreement; that said Whiteman and

Pool did not turn over to plaintiff said notes, according to the agreement, as they had authority to do, and said notes were permitted by plaintiff to remain in the note case of said bank, and when said notes were collected the proceeds went into the general funds of said bank and were not applied to the payment of plaintiff's note, as was agreed upon by all the parties to the transaction, including plaintiff; that these defendants relied, in signing the note herein sued upon, on the full carrying out of the plan as above set out to replenish the depleted capital stock of said bank, and entered into the plan believing that the same would be fully carried out and that the said Whiteman would have the full amount of money advanced by him refunded to him through the collection of the notes that it was agreed should be turned over to him; that these defendants entered into said arrangement and signed said note without any consideration whatever moving to them or either of them; that the same was all done to keep the bank in a going condition; that previous to the above transactions the board of directors had passed a resolution and spread the same upon the minutes of said board authorizing the officers of the bank to use its assets to borrow money and to pledge the same for debt."

In addition to adopting the above answer, Wooley pleaded as follows:

"And for further special answer herein this defendant says that on the 2d day of January, 1922, he had occasion to enter the directors' room of the First State Bank of Annona, Tex., in which, at that time, the directors of said bank were having a meeting, as alleged in the special answer of the other defendants herein; that while in said room one Mr. Kennedy, a state bank examiner, requested this defendant to sign the note herein sued upon, and this defendant refused to do so, stating that he was not a director of said bank, whereupon said examiner, in the presence and hearing of plaintiff and the other directors of said bank, explained the situation and the plan to raise the $3,000, as detailed in the special answer of the other defendants herein; that this defendant, relying on the statements of said bank examiner and the sincerity and integrity of the president and board of directors of said bank, there present and hearing the explanation of the bank's condition and the plan to give relief to said bank made by said bank examiner, signed said note as one of the makers of the same; that he signed the same without any consideration moving to him, and would not have signed said note had he believed the representations of said examiner to be false; that he did not learn of the deception practiced on him until some twelve months thereafter, when he was informed by the plaintiff herein that the notes were not turned over to him, as per the agreement, and that said bank examiner had threatened to close said bank if said notes were taken out by him; that if the explanation of the plan to raise the $3,000 made by said bank examiner in the presence and hearing of plaintiff and the other members of the board of directors of said bank was false, this defendant's signature to said note was obtained by fraud, deceit, and misrepresentation and this defendant is not bound thereby."

Bishop, after testifying that the bank examiner was present at the meeting referred to in the pleadings, and had informed them that the bank was in a "shaky condition" and had to have some money, said:

"I don't know who suggested * * * that Mr. Whiteman would let the bank have the money, * * * and he made us the proposition that if we would put up good notes, as I understood, sufficient above the amount, he would let the bank have $3,000, and he and Pool would select the notes from the case, just such notes as we called good notes; and they were to be turned over to Mr. Whiteman to secure him for this loan to the bank."

In answer to the inquiry as to his understanding about who was to collect those notes and what was to be done with the money, the witness said, in substance, that Whiteman was to collect the notes and apply the proceeds to the payment of the note which they were to make to him. The bank at that time held good notes amounting to about $45,000 in value, and these were in a note case on the table around which the parties were then sitting. The notes Whiteman was to get were "to offset" the note sued on. Witness learned later that Whiteman had not taken the notes out because of an objection made by the bank examiner and a threat to close the bank if the collateral notes were taken. Further testifying, he said:

"In that agreement there, or in signing this note, it was to be paid by these notes that * * * were to be turned over to Mr. Whiteman. It was not to be paid in any other way that I know of. We put up the notes for the money— aimed for him to get the cash out of the notes, and we are not responsible for the note. * * * I have stated that I did not get any of this money myself. I signed it for the bank. Mr. Whiteman actually paid out his money, this three thousand dollars. * * * He gave his check that went to the bank, and the bank was accommodated. The bank received the money."

Puckett testified substantially as Bishop concerning the condition of the bank and the circumstances under which the loan by Whiteman was made, stating that Kennedy, the examiner, told them that they must raise $3,000 that day or he would have to close the bank. He asked those around the table if they had the money, "and Mr. Whiteman said he had $3,000 in the bank, and he (Kennedy) told him then to let the bank have the $3,000 and make a note for it and the directors would sign the note and put up the collateral of the bank for security, and Mr. Kennedy wrote out the check had also wrote out the note there, and it was signed by the directors. * * * My understanding was that Mr. Kennedy and Mr. Whiteman and Mr. Pool were to select these notes. Mr. Wooley, when they called on him to sign this note, said, 'I don't sign notes, but the bank being in this condition I will help it out if it is no obligation on me.' He (Kennedy) told him it was

just a bank obligation, and the proceeds of the notes they would put up here as collateral would pay the note that they were signing."

As to why the collateral was never delivered to Whiteman, Puckett said:

"It was some time after the execution of this note before I found out that Mr. Whiteman had not gotten the notes that were agreed upon. I don't know just how long it was, but several months after. I know this: The notes had been pencil marked right on the notes, 'H. S. Whiteman.' They were notes that he and Mr. Pool had picked out for this note, and then it came up in the directors' room why he had not gotten those notes, and when I saw it on there I asked the question why it was marked on those notes, and he said those were the notes they picked out for that note that Mr. Whiteman let us have the three thousand dollars for. I believe Mr. Whiteman was there about it, but I will not be positive about that, whether he was or not. He usually came down pretty near every meeting. As to why Mr. Whiteman did not have the notes, and they were there in the note case, Mr. Pool said that the examiner told him if he took the notes out—it had been some time after this meeting that this note was signed that this pencil mark was marked up there—and he said if he took them out he would close the bank, and that is the reason they were not taken out of the note case, and I said, 'If you all take them out you will go to the penitentiary, and you will go without me, because I am not going to stand for it.' "

Wooley testified, in part, as follows:

"When he (the bank examiner) first asked me about whether or not I would sign the note and I said no, he then stepped in the other room and came back in there in the directors' room. He then asked me if I would sign the note if they would turn over to Mr. Whiteman $3,000 worth of the notes—pick the notes out and turn them over to Mr. Whiteman—and I said I would. * * * The conversation about my signing the note was made with the bank examiner. I don't think Mr. Whiteman asked me to sign the note, but I am not sure about that; I am not positive about it. He was there talking about the note, but I don't think Mr. Whiteman asked me to sign it; the bank examiner asked me to sign it. * * * It (the note) was to be made for the purpose of getting money in that bank, and it was to be paid by the $3,000 worth of notes that Mr. Whiteman was to take out of the bank."

Whiteman testified, in substance, that they were in the directors' room; that the examiner told them the capital stock of the bank was below what was required by law, and they must raise some money if the bank was to remain open for business. In some way it became known that he (Whiteman) had $3,000 in cash. The examiner suggested that he loan that sum upon a note to be executed by Bishop, Puckett, Pool, and Wooley, and to this he agreed. He was to have, in addition to these names, good notes belonging to the bank as collateral. Under that agreement the parties executed the note and he gave

his check for the $3,000, which was placed to the credit of the bank. He said:

"If they had not agreed to that I don't suppose I would have let them have the money. * * * I was not to collect this money on these notes and apply it on this note. I was not to collect anything except off of these directors. They were the ones responsible to me. I am sure these notes were to be turned over to me, but they were not turned over. I was down there some time afterwards, and went over some notes with Mr. Pool (the cashier), and he wrote my name on some of them and said he would take down a list of the names and mail the notes to me. I did not mean to take these notes and collect them. I expected these other parties."

Again, he said:

"I could never get the notes. I did not get them myself because I did not know the best notes, or good notes. It is a fact that my name was written on about $3,000 worth of the notes, but I never did get them. I tried to get them after that, and wrote him (probably meaning Pool), and went down there several times, but never did go into the note case and get them."

In a trial before the court without a jury a judgment was rendered in favor of Whiteman against defendants Pool, Bishop, and Puckett. Wooley was discharged upon the ground, as stated in the judgment, that he was not liable for any part of the indebtedness. Whiteman has appealed from that portion of the judgment which denied a recovery against Wooley.

The defense of Wooley and the other makers of the note is, in substance, that the note represented a bank obligation and was to be paid out of the bank's property, notes called collateral, to be placed in the hands of Whiteman; that Whiteman was to collect those notes and apply the proceeds to the payment of his note, and this was the only method agreed on for payment. There are in the pleadings of Wooley some vague intimations of fraud and deception, which will be discussed later.

The appellant excepted to the pleadings setting up that defense, and objected to the parol testimony introduced to sustain it. The exceptions and objections were overruled, and those rulings are assigned as error. Appellant also complains of the refusal of the court to render judgment in his favor on the legal evidence admitted.

[1, 2] As will be seen from an inspection of the note sued on, it is in the usual form of negotiable promissory notes. Upon its face it binds the makers, jointly and severally, to pay to Whiteman the sum of $3,000 on a specified date, with interest from maturity, and 10 per cent. as attorney's fees in the event the note is collected by an attorney. It also recited that collateral is deposited as security for payment. It is a plain, unambiguous negotiable promissory note. In the absence of fraud in securing the signatures

of the makers, parol evidence is not admissible to show a contemporaneous agreement which varies or contradicts the terms of such an instrument. It is evident from the record that the judgment of the trial court in favor of Wooley is based upon the pleading and proof of a contemporaneous parol agreement which does contradict and vary the terms of this note. The action of the trial court in considering the parol agreement is here defended, not upon the ground that Wooley's signature was procured by misrepresentation or fraud, but upon the proposition that under the law as it now exists parol evidence is admissible to show all the terms and conditions on which the note was delivered, even though the parol terms may conflict with the writing. As supporting that proposition counsel for appellees refer to section 16 of the Negotiable Instruments Law, which appears as article 6001—16, Vernon's Ann. Civ. St. Supp. 1922, and is as follows:

"Every contract on a negotiable instrument is incomplete and revocable until delivery of the instrument for the purpose of giving effect thereto. As between immediate parties, * * * the delivery, in order to be effectual, must be made either by, or under the authority of the party making, drawing, accepting or indorsing as the case may be; and in such case the delivery may be shown to have been conditional, or for a special purpose only, and not for the purpose of transferring the property in the instrument. * * * And where the instrument is no longer in the possession of a party whose signatures appears thereon, a valid and intentional delivery by him is presumed until the contrary is proved."

That provision of the statute was evidently intended to permit the maker of a note found in the hands of the payee, or one holding by assignment with notice, to prove the conditions under which the title to the note was to pass and the note becoming binding obligation. It furnishes no authority for permitting proof of a contemporaneous parol agreement contradicting or varying the plain terms of the written instrument after the title had passed and the writing had become a binding contract; nor do the decided cases furnish any precedent for such an infraction of the well-established rule which excludes parol evidence tending to vary the terms of written contracts. They are practically unanimous to the contrary. Chalk v. Daggett (Tex. Com. App.) 257 S. W. 228; King v. Wise (Tex. Com. App.) 282 S. W. 570; Adams Nat. Bank v. Stone (Tex. Civ. App.) 284 S. W. 989; Waters v. Byers Bros. (Tex. Civ. App.) 233 S. W. 587; Wise v. Boyd (Tex. Civ. App.) 267 S. W. 543 (the reversal of this case by the Supreme Court [King v. Wise (Tex. Com. App.) 282 S. W. 570], on another issue indicated an approval of the holding on this question); Lee v. First Nat. Bank (Tex. Civ. App.) 254 S. W. 397. Numerous other cases to the same effect are referred to in those cited above and in the extended note to Vincent v. Russell, 20 A. L. R. 421.

There is a well-recognized rule which permits the introduction of parol evidence to prove material terms when only a portion of the entire contract has been reduced to writing. But in this state that rule has not been carried so far as to permit the introduction of parol evidence to contradict or vary the terms which have been reduced to writing. It is also true that under certain conditions, and with appropriate pleadings, a maker of a note is permitted to prove by parol evidence that the delivery of the note was made on condition and with the understanding that it was to become a binding obligation, or a completed contract, only upon the happening of some specified event or the doing of some designated act. But no such conditional delivery as that is pleaded or proven in this case. The defense is that the note was a bank debt and Wooley was not to be liable in any event. The intimations of a deception, appearing in Wooley's answer, while insufficient to state a defense based on fraud in procuring his signature, are sufficient to negative a defense upon the ground that he signed with the understanding that the note was to be binding on him only in the event some other event occurred or act was performed. If Wooley was induced to sign and deliver the note by a deceptive promise regarding the placing of the collateral with Whiteman for subsequent use in payment of the note, the delivery of the collateral could not have been a condition which must precede the taking effect of the note.

In the case of King v. Wise, supra, a maker of a note was permitted to prove by parol a conditional liability, but only for the purpose of establishing fraud on the part of the payee in securing the signature of the maker. That is made clear by the following extract from the opinion:

"Deceitful procuration of an apparent agreement is a defense primarily, because there can be no real assent when it is induced by fraud. 1 Elliott on Contracts, § 70. The defense relates back to the inception of the matter and, if established, it operates ab initio. Hence, when the deceit consists in the making of a contemporaneous and collateral promise, the admission of its proof is not for the purpose of varying the terms of the written instrument (whose execution was thus procured), but for the purpose of showing facts which prevented the instrument from taking effect as a binding obligation."

It also appeared from the facts in that case that the maker was a surety who signed the note without any consideration, and after its execution and delivery by the principal obligor.

It follows from what has been said that the trial court should have excluded the parol agreement relied on by Wooley as a defense to this suit, unless his pleadings and his

proof were sufficient to support the conclusion that his signature to the note was procured by fraud for which Whiteman may be held responsible. The parol agreement was not admissible for the purpose of proving a contract different from that evidenced by the note, but only for the purpose of showing that no valid contract was entered into by Wooley.

Ater detailing the statements made by the examiner on that occasion relative to the financial condition of the bank, and the plan suggested for its relief, Wooley alleges:

"That he signed the same (the note) without any consideration moving to him, and would not have signed said note had he believed the representations of said examiner to be false; that he did not learn of the deception practiced on him until some twelve months thereafter, when he was informed by the plaintiff herein that the notes were not turned over to him as per agreement, and that said bank examiner had threatened to close said bank if said notes were taken out by him; that is the explanation of the plan to raise the $3,000 made by the said bank examiner in the presence and hearing of the plaintiff and the other members of the board of directors of said bank was false, this defendant's signature to said note was procured by fraud, deceit and misrepresentation."

[3] It will be observed that while this pleading contains some intimations of fraud, they refer to the conduct and statements of the bank examiner, who originated the scheme for relieving the bank. There is not only no charge of fraud against Whiteman in the pleadings, but there is not the slightest proof of fraud against him in the evidence. He made no representations whatever; he merely agreed to the terms and conditions outlined by the examiner, and seems to have acted in the utmost good faith. In fact, he complains that he was the one injured by the failure of the examiner to permit the withdrawal of the collateral. Hence, if there was any fraud perpetrated, or mispresentation made, to induce Wooley to sign the note, it came from the examiner, who appeared as the spokesman for all the parties interested in relieving the bank's financial condition. It is not likely that he had any fraudulent purpose, because he had nothing to lose by the bank's failure, nor anything to gain by its continued operation. It is true that he did not himself deliver the collateral to Whiteman, as he agreed to do. But it is highly probable that upon reflection he saw the futility of such a scheme for relieving the bank, and from a sense of duty rather than an intent to deceive refused to sanction the withdrawal of the notes from the bank's possession. It was not the bank's cash reserve, but its capital stock, that was to be made good. It is difficult to understand how the interested parties could expect to accomplish that result by having the bank to borrow money on its own account. or by pledging its property as a primary fund for the payment of this note. The legal result of either transaction would be to leave the bank's capital stock in the same impaired condition. The $3,000 added to its cash on hand by Whiteman's loan would be offset by the bank's obligation to repay the loan. If the refusal of the examiner to place the collateral with Whiteman, or permit it to be done by the officers in charge, was due to a change of mind. there was no fraud of which Wooley can complain. Bigham v. Bigham, 57 Tex. 238; Railway Co. v. Titterington, 84 Tex. 218, 19 S. W. 472, 31 Am. St. Rep. 39; King v. Wise (Tex. Com. App.) 282 S. W. 570.

Without any fraud on his part, or for which he could be held responsible, Whiteman parted with his money on the faith of this note signed by Wooley and others. That alone is sufficient to constitute a valuable consideration. Nor is it true that Wooley and the other makers failed to receive a personal benefit from the transaction. They had just been told of the bank's financial condition and that it would be closed unless the amount of $3,000 was added at once to its capital stock. That, of course, meant that the bank's net assets must be increased to that extent. The closing of the bank under those conditions would mean a loss to Wooley and the other stockholders. Its continued operation would furnish an opportunity to avert that loss and secure a possible gain. Article 523, Rev. Statutes 1911, contains this provision:

"Whenever the commissioner shall have reason to believe that the capital stock of any corporation, subject to the provisions of this title, is reduced, by impairment or otherwise, below the amount required by law, or * * * articles of association, he shall require such corporation to make good the deficiency."

[4, 5] The duty of making good the deficiency devolves on the stockholders as the real owners of the corporation. First State Bank v. First Nat. Bank (Tex. Civ. App.) 145 S. W. 691. It was intimated in the case referred to that the stockholders might be assessed certain amounts for the purpose of making good such deficiency. It follows that Wooley either received or expected to receive a personal benefit from the money advanced by Whiteman. In that connection it may be proper to call attention to the fact that the note given drew interest only from maturity. In that way Whiteman made a contribution, toward raising the fund, equal to the interest on the money for one year.

Wooley is not in this instance an accommodation maker; nor is he in a position to avoid his liability as a maker on the ground that his signature was procured by fraud. The judgment of the trial court will therefore be reversed and judgment here rendered against Wooley for the amount of the note, including interest and attorney's fees. That portion of the judgment not appealed from will remain undisturbed.