SHAW, Banking Com'r, v. McSHANE et al.*
No. 3820.

Court of Civil Appeals of Texas. Texarkana.
Nov. 5, 1930.

Rehearing Denied Dec. 18, 1930.

*Writ of error granted.

King, Mahaffey, Wheeler & Bryson, of Texarkana, for appellant.

Keeney & Dalby and Rodgers & Rodgers, all of Texarkana, for appellees.

HODGES, J.

This suit was filed by the banking commissioner of Texas against the appellees on three promissory notes aggregating $7,311.94, less a credit of $450 on one of the notes. The notes were executed on different dates during the year 1923, payable to the Guaranty State Bank of Texarkana, and were signed by N. A. Shaw, E. D. Trigg, J. F. Rochelle, J. P. McShane, R. W. Rodgers, and V. A. Ghio. N. A. Shaw, one of the signers of the notes, died before the institution of this suit, and his widow, Mrs. Corine Shaw, independent executrix of his estate, was made a party defendant.

The defense is that the notes were executed by all the parties solely for the accommodation of the bank and without any consideration. In a trial before a jury upon special issues, a judgment was rendered in favor of the defendants. This appeal is prosecuted by James Shaw, who held the office of banking commissioner of Texas at the time the case was tried.

The testimony in which there is no material conflict discloses the following facts:

The Guaranty State Bank was organized under the laws of Texas in 1916 with a capital stock of $50,000. A large portion of its business consisted of loans to farmers in the surrounding territory. Among those to whom loans were made was W. R. Garland, who owned a farm situated in Miller county, Ark. The farm was purchased some time prior to 1921 for a cash consideration of $20,000, and eleven promissory notes for $5,000 each, aggregating $55,000.

Each of the notes stipulated for a retention of a vendor's lien on the land and was payable on different dates over a period of

eleven years. The interest was to be paid annually. There was also a stipulation in the notes providing that in event of default in the payment of any installment of interest or principal when due, the holder of the notes had the right to declare the entire indebtedness due. Eight of these notes, aggregating $40,000, were sold and transferred by the holder to Lee Tayloe of Clarksville, Tex. The remaining three, aggregating $15,000, were transferred to the Guaranty State Bank as security for an indebtedness to that bank. It further appears from the evidence that in the contract transferring the notes there was an agreement between the interested parties that Tayloe should have a lien superior to that of the bank.

In March, 1922, Garland owed Tayloe the sum of $6,758.90 as accumulated interest on the notes. Tayloe threatened to exercise his option and declare the entire indebtedness due and foreclose his lien on the land in Miller county in the event payment was not then made. Garland notified the bank of his inability to pay the note, and Col. N. A. Shaw, one of the signers of the note sued on, who was at that time the president and in the active management of the Guaranty State Bank, undertook to procure the money for him in order to protect the security held by the bank as second mortgagee. The defendants Rochelle, Ghio, McShane, Rodgers, Trigg, and Shaw, were at the time directors of the bank and constituted the entire board, with the exception of one member who is not a party to this suit. Shaw, being unable to procure money from any other source, directed Trigg, who was the cashier, to pay over to Tayloe the sum of $6,758.90 out of the bank's money in payment of the interest due from Garland. That transaction occurred on or about March 14, 1922. In consideration of that payment, Tayloe executed and delivered to Shaw an assignment of his lien on the land to the extent of the payment made, but stipulated that this assigned lien should be inferior to the lien retained by Tayloe. At the time that payment was made to Tayloe, Shaw executed his personal note payable to the bank for an equal amount. That note was listed and carried on the books of the bank as a part of its assets. Two days later, and at the request of Shaw, Garland executed his note for a like amount payable to the bank. Garland's note, however, was not listed on the books of the bank among its bills receivable, but was kept in the bank's safe.

A short time after the execution of the note by Shaw, the defendants Rochelle, Rodgers, Trigg, McShane, and Ghio also signed the note executed by Shaw. Each of them testified that he signed the note solely for the accommodation of the bank and without any previous agreement or understanding that he would sign it. Each further testified that he received no benefit from that transaction.

It is admitted that the notes here sued on are renewals of this original note signed by Shaw at the time the money was paid to Tayloe on Garland's debt.

By an appropriate reply to the defense of want of consideration, the appellant presents the issues hereafter discussed. At the conclusion of the testimony the appellant requested a peremptory instruction in its favor against all of the defendants. That was refused by the court and the case was submitted on special issues. The findings of the jury in response to those issues are, in substance, as follows:

First. That defendants Rochelle, Rodgers, Trigg, Ghio, and McShane did not agree to sign the original note for $6,758.90 before the money was paid by the Guaranty State Bank to Tayloe.

Second. That the original note above referred to was executed by the above-named defendants solely for the accommodation of the bank and for the purpose of protecting the assets of the bank.

Third. That there was an agreement between the above-named defendants and the active officers of the bank that all payments thereafter made by Garland to the bank should be applied as a credit on said note or renewals thereof.

Fourth. That the makers of the original note at the time they signed the same knew that $6,758.90 of the bank's money had been paid to Lee Tayloe to settle interest due him from Garland, and that such note was to be carried as an asset of the bank in place of, or to represent, the money thus paid out to Tayloe.

Fifth. That all of the makers of the original note were members of the board of directors of the bank and, at the time, owned as much as 50 per cent. of the capital stock of the bank.

Sixth. That before this money was paid to Tayloe on Garland's indebtedness for interest, Garland owed the bank a sum equal to or exceeding 25 per cent. of the bank's capital stock and certified surplus.

Seventh. That the bank did not part with anything, and that the defendants Rochelle, Rodgers, Ghio, Trigg, and McShane did not receive any benefit by reason of their signing the note for $6,758.90, and that they signed this note after the money had been paid to Tayloe.

Upon those answers the court entered a judgment in favor of all the defendants. The following are the propositions upon which the appellant relies for a reversal of the judgment:

First. That the court should have instructed a verdict in its favor "because as shown by the undisputed evidence, the execution and delivery of the notes sued on, as well as the

parent note of which they are renewals, were attended by such circumstances, and the makers of the note bore such relation to the Guaranty State Bank, as that they were precluded from introducing any testimony to show that the notes, each of which recited a valuable consideration, were in fact executed without consideration and were, under the undisputed facts, estopped to deny their liability for the payment of such notes according to their legal tenor and effect."

Second. "Under the undisputed evidence and the findings of the jury, the appellant was entitled to have a judgment rendered in its favor, for the amount of the notes sued on, with interest and attorney's fees, less the credit of $450.00 endorsed upon the smallest of them, and the court erred in rendering judgment against it and in favor of the appellees."

Third. "The appellees clearly are estopped, in view of the undisputed evidence, and the findings of the jury, to urge that the notes in suit were executed without consideration, and because they are thus estopped, it was error for the court to render judgment in their favor."

In view of the disposition made of the case, it is unnecessary to quote the fourth proposition.

It conclusively appears from the evidence that the money paid to Tayloe was applied to the payment of Garland's debt to Tayloe and was intended to be used for that purpose. While the draft for the money was drawn against Shaw and the subrogation agreement was made in Shaw's name, it is conceded that he was acting for the bank.

We may, therefore, treat the transaction as a purchase by the bank of Tayloe's claim against Garland. Such a purchase was but an indirect loan of the bank's money to Garland within the meaning of the statute which limits the amount of money a bank may loan to one person. Article 554 of Penal Code of 1925.

The proof shows that at the time this indirect loan was made to Garland, he owed the bank for prior loans an aggregate sum equal to 25 per cent. of the bank's capital stock and certified surplus, the limit fixed by law. Hence this indirect loan was in plain violation of the terms of the statute, and the agents of the bank who were responsible for it became personally liable to the bank for whatever loss might follow as a result of the loan having been made. The statutory prohibition against excessive loans by banks is plain and emphatic and cannot be evaded by showing that it is to the bank's interest under the particular circumstances for its money to be so invested. Thompson v. Greeley, 107 Mo. 577, 17 S. W. 962; Cockrill v. Cooper (C. C. A.) '86 F. 7, 12; First Nat. Bank v. Hubbard, 211 Mo. App. 9, 240 S. W. 854.

The rule is well settled that when an agent loans money belonging to his principal in violation of instructions, the agent becomes personally liable for whatever damages the principal may sustain as a result of the unauthorized loan. Such liability arises from the misconduct of the agent in handling his principal's money. Fidelity & Deposit Co. of Maryland v. Risien (Tex. Civ. App.) 284 S. W. 977; Brown et al. v. Farmers' & Merchants' Nat. Bank, 88 Tex. 265, 31 S. W. 285, 33 L. R. A. 359; Seale v. Baker et al., 70 Tex. 283, 7 S. W. 742, 8 Am. St. Rep. 592; 1 Clark & Skyles on Law of Agts. 875, § 384.

The officers and directors of a bank are its agents, and are charged with the duty of exercising at least ordinary prudence and care in safeguarding the bank's interest and in loaning its money to third parties. The imposition of a limitation by law on the amount that may be loaned to any person is, in effect, an instruction to bank officials. To knowingly exceed that limitation is a disobedience of legislative instructions and subjects the offenders to the same liability which would follow the disobedience of private instructions by an agent in any similar transaction.

If those bank officials who authorized or caused the excessive loan to Garland to be made in this instance became personally liable to the bank for any loss that might result, such personal liability for the money would furnish a legal consideration for a promissory note to pay that debt if the borrower failed. Such officials will not be permitted to plead and prove as a defense that they executed the note for the accommodation of the bank. Rogers v. First State Bank, 79 Colo. 84, 243 P. 637; German American State Bank v. Watson, 99 Kan. 686, 163 P. 637. As to such officers, the principle of estoppel as pleaded by the appellant of this suit would be applicable.

The question then arises: Who of the officers of the Guaranty State Bank caused the excessive loan to Garland? The evidence conclusively shows that N. A. Shaw, the bank's president, was one if not the only party responsible for that loan. He authorized the draft drawn in Tayloe's favor upon which the money was paid out, and personally directed the payment of the draft out of the bank's funds. The subrogation agreement was delivered to him for the bank. Clearly, we think, the appellant was entitled to a judgment against Shaw's estate. In fact, in framing the controlling issue, the jury was interrogated only as to the connection of the defendants Rochelle, Rodgers, Trigg, Ghio, and McShane to the loan transaction. As to those defendants, the material facts and findings of the jury are different. Upon evidence which must be regarded as sufficient, the jury found that those directors signed the note after the money was paid out to Tayloe and

that there was no prior agreement that they would sign such a note in the event the money was paid. The judgment rendered involved the finding that those directors were not parties to the excessive loan to Garland, and we cannot say, as a matter of law, that such a conclusion is unwarranted by the evidence.

The jury further found, in effect, that the bank did not part with its money on the faith of those signatures to the note. Those defendants are therefore in the position of sureties who become such after the debt is contracted, and the money paid over to the borrower and who sign without an additional consideration. Under that state of facts, they have a right to rely upon the defense of want of consideration as long as the note remains in the hands of the bank, or one standing in its shoes. King v. Wise (Tex. Com. App.) 282 S. W. 570; Good v. Martin, 95 U. S. 90, 24 L. Ed. 341; Jones v. Ritter, 32 Tex. 717; Joyce on Defenses to Commercial Paper (2 Ed.) § 54.

The evidence and findings of the jury warranted the court in concluding that there was no legal consideration for the signing of the original note made by the defendants Rodgers, Rochelle, Trigg, Ghio, and McShane.

But counsel for appellant contend that on account of the relationship of those directors to the bank, they should be estopped to plead in this suit the defense of want of consideration. Estoppels are enforced to prevent injury to one who has done something, or has failed to do something, by reason of the conduct or representations of another. According to the record in this case, the bank did nothing and parted with nothing on account of the signature of the directors above named. The loan to Garland had been completed and the transaction closed when they signed the note. Since the bank was the party accommodated, it was in no position to invoke an estoppel against these directors if, while a going concern, it had undertaken to enforce payment of the note. The situation would be different if the note had been transferred for value to some other party even though the transferee knew that those directors had signed the note for accommodation. 1 Daniel on Negotiable Instruments (5 Ed.) § 786. But as long as accommodation paper remains in the hands of the one accommodated, if the rights of no other party have become involved, it is subject to the defense of want of consideration.

The directors of a bank are under no obligation to sign their names to a note for the accommodation of a bank in order to protect it against loss from a bad loan for which they are not responsible. Their refusal to perform a gratuitous promise is no more of a fraud against the bank than would be the refusal of another party under the same circumstances.

However, a situation might arise where a receiver of an insolvent bank might invoke an estoppel against such accommodation makers in behalf of a bank's creditors and depositors. If the accommodation paper was executed and placed among the bank's assets for the purpose of deceiving the bank examiner and thereby prevent the closing of a bank, such makers would not be permitted to plead and prove the defense of want of consideration. Or if it be shown that the bank was in financial straits, or was insolvent and that credit had been extended to the bank by depositors and other creditors on the faith of such accommodation paper, a receiver in possession of such paper might invoke the rule of estoppel against those who had loaned their names to the bank for the purpose of enabling the bank to secure credit that would not otherwise have been given. Rogers v. First State Bank, supra, and German American State Bank v. Watson, supra. But that is not the state of facts shown by the record in this case. There is here no evidence that the bank was insolvent at the time this original note was executed, nor is there any evidence that this loan to Garland upon Shaw's note alone impaired the capital stock of the bank. We must presume, therefore, that both the bank and Shaw were solvent at the time that transaction took place. The fact that the bank has since passed into the hands of the commissioner does not alter the situation materially. In taking over the assets of an insolvent bank, the commissioner succeeds to the rights of the bank with reference to the management and control of its assets. His position is similar to that of a receiver or trustee in bankruptcy, or the executor or administrator of the estate of a decedent. He holds the notes and claims due the bank subject to those defenses which might be set up in a suit by the bank itself. Keller v. Smalley and Harris, 63 Tex. 512; Scott v. Armstrong, 146 U. S. 499, 13 S. Ct. 148, 36 L. Ed. 1059; Fourth Street Nat. Bank v. Yardley, 165 U. S. 644, 17 S. Ct. 439, 41 L. Ed. 855; Steelman v. Atchley, 98 Ark. 294, 135 S. W. 902, 32 L. R. A. (N. S.) 1061; Fisher v. Simons (C. C. A.) 64 F. 311; Ryder v. Ryder, 19 R. I. 188, 32 A. 919; Reeves v. Pierce, 64 Kan. 502, 67 P. 1108; Kennison v. Kanzler (C. C. A.) 4 F.(2d) 315; 1 Daniel on Negotiable Instruments (5th Ed.) 781; 1 Tardy's Smith on Receivers, 88, and cases referred to in notes. There is nothing in the evidence in this case that would require the application of a different rule from that laid down in the cases above cited.

It is also contended that if the defendants Rodgers, Rochelle, Ghio, Trigg, and McShane did not participate in the loan of the bank's money to Garland, they nevertheless ratified the act of Shaw in making the loan and thereby became liable with him for what he had done.

Shaw was not the agent of the other directors and was not acting for them when

he made the loan to Garland. He was the president and managing officer of the bank and was acting as the bank's agent. The only evidence of ratification furnished by the record is found in the acts of the other directors in signing the note after the loan had been made. This amounted to no more than an acquiescence in what Shaw had done. A subsequent acquiescence in that manner was not essential to complete the loan transaction—that had already been consummated. One agent of a corporation does not become a particeps criminis merely because he approves a wrongful act committed by another agent of the same principal. The doctrine of ratification has no application to this case.

As before stated, we think the record warranted a judgment against Shaw's executrix. But, since there is no specific complaint of the failure of the trial court to render such a judgment against her alone, we have concluded to affirm the judgment in its entirety, and it is accordingly so ordered.

### On Motion for Rehearing.

It seldom happens that the writer of an opinion disposing of a case on appeal is the only member of the court who, upon further consideration, questions the soundness of that opinion. But that has occurred in this case. The writer is now the only member of this court who thinks the conclusions stated in the original opinion are incorrect. Further consideration of the questions involved has convinced me that the controlling conclusions of law stated in the original opinion are not warranted by the record.

I shall now state my reasons as briefly as the nature of the case will permit.

The case was disposed of in this court, and probably in the trial court, on the theory that the original transaction, the payment of $6,758.90 to Tayloe in March, 1922, was an indirect loan of the bank's money to Garland and in violation of the statute which prohibits excessive loans to a single individual. I am now convinced that the record does not warrant that conclusion. The following is, I think, a fair statement in brief of the material facts involved:

The Guaranty State Bank, of which Shaw was president, and the appellees, other than Mrs. Shaw, were directors, was in danger of being closed because of the economic and financial conditions then existing. It had loaned a large amount of money to farmers which it was unable to collect, and for that reason its affairs were not in a satisfactory condition. It had loaned Garland a considerable amount, the limit allowed by law to be loaned to a single individual. Garland was unable to repay on account of short crops and low prices of farm products. His indebtedness to the bank was secured by a second lien on his farm situated in Miller county, Ark. Tayloe, who held the first lien

against that land, was threatening to foreclose because of the failure of Garland to pay an installment of interest amounting to $6,758.90 then due. The bank officials believed that such a foreclosure at that time would result in a sacrifice of the Garland property and an entire loss of the security it furnished. Because of the limitation fixed by law, the bank could not make any further loans to Garland for any purpose, and Garland was unable to procure from any other source the money necessary to pay his debt to Tayloe.

In order to satisfy Tayloe and prevent a sacrifice of the security held by the bank, Col. N. A. Shaw directed Tayloe's attorney to draw on him personally for the amount required. The draft was accordingly drawn and paid by Shaw with the funds of the bank. Shaw immediately executed his personal note payable to the bank at some future time for the exact amount of the bank's money which had been paid out on the draft. A short time thereafter that note was signed by the other bank directors, who are the appellees in this case. The Shaw note was listed on the books of the bank and carried as a part of its assets in the place of the money which had been paid to Tayloe. That use of the note was intended by all the officers and directors connected with the transaction.

A few days after the Shaw note was executed, Garland, at the instance of Shaw, also executed a note for the same amount payable to the bank. The Garland note, however, was not listed on the books of the bank but was kept in a safe. It was understood and agreed by the officers and directors that whatever Garland paid on his note should be applied as a credit on the Shaw note.

The evidence makes it plain that neither Shaw nor the other directors intended by that transaction to make either a direct or an indirect loan to Garland. While they did intend to raise the money necessary to satisfy Garland's debt to Tayloe, they did not intend to make his note the true and only consideration upon which the bank's money was taken and paid over to Tayloe. They fully understood that they could not do that without violating the law.

Trigg, the cashier, testified:

"I let the money go out on Mr. Shaw's note under his instructions. I was the cashier of the bank, but he was my superior officer.

"Q. You loaned money to Mr. Shaw? A. It was Mr. Garland's transaction. I loaned the money strictly on Mr. Garland's note. Mr. Shaw gave his note temporarily. Mr. Shaw got the directors to sign it, and I signed it at his request.

"Q. You took Shaw's note for the money, and Mr. Garland's note you did not have? A. Originally it was Mr. Shaw's. Yes, paid out money on Mr. Shaw's note. * * * Gar-

land owed something over fifteen thousand dollars, and if we had not paid the interest they would have foreclosed. Yes, I signed the note for the bank—the note was given temporarily till Mr. Garland could take it up. We had two ways of paying it, either Mr. Garland would pay it, or Mr. Shaw would make arrangements in some way. The Garland note was the asset representing that note. We did not figure that note was of any value."

Again the witness says:

"We knew that we could not lend Mr. Garland anything without violating the law, and finally they settled on the plan of placing the (Shaw) note in there temporarily until he could take it up, and put their note in there because they knew the bank could not lend him the money."

Ghio testified:

"I just signed that note with the rest of the directors, and they signed it, I imagine, to protect the bank's interest. They figured that they would carry it until Garland could make a crop and·pay it. If he did not make a good crop—well, they didn't figure on paying the note; they figured that it could run on until Garland could pay it. I wasn't putting up the note for Garland. Yes, I was protecting the bank from losing the money; that was what I had in mind. I figured that we would get it from Garland's crop the next year. We carried this note as an asset of the bank—I signed the note (the Shaw note) to take the place of that money that was paid out as an asset. The Garland note was not carried as an asset, it was in the safe. We had already loaned Mr. Garland the limit."

R. W. Rodgers testified:

"Mr. Garland owed the bank just about the legal limit; I don't remember the exact amount, but this loan would have put him over, and they were about to foreclose; and Mr. Shaw and Mr. Garland were friends, very close, back in Red River County, and at the same time Roy Taylor owed his note. Back in 1921 they made nothing, practically, in the way of crops, and I was in correspondence with Memphis people to keep down foreclosure for Roy Taylor. In Arkansas you foreclose in the Chancery court, and it is always in session, and they had to make the crop, and the·bank felt that they had to take it up to save what they had, and there isn't any question in my mind until this good day, but that Mr. Garland's equity would have more than paid the bank every dollar that he owed—it was decided by the board that there wasn't but one way to handle it, and that is the way we did handle it."

Again the witness stated:

"I did not intend to lend my credit to Garland and I didn't do it; it wasn't thought of or discussed, he never spoke to me about it·at all, I just did it to save what the Guaranty State Bank had already invested there, the only way to save it."

Again the witness stated:

"I did not keep the bank records, I did not know what the bank had. Mr. Shaw and Mr. Trigg were the ones who knew about that, but the records show that on the 14th day they paid this off (Tayloe draft) and took a note for that amount, and' my judgment is that Mr. Shaw put that (note) in, and as we came in we signed it. That is the way I think it was done, one at a time, we did not have any meeting to do it."

Again he said:

"I don't remember the identical amount of Mr. Garland's debt, but I knew this money would put him above the legal loan. That plan was not adopted simply to make him an additional loan. I asked him, the examiner, what to do, and he said we could make a directors' note. He did not tell me that we could make a directors' note that didn't have to be paid."

Rochelle testified:

"I suppose that I knew the notes would be put in there to represent what had been paid out on Garland's note. They were placed there as assets until it could be worked out. I was trying to help the bank from closing. From what Mr. Kennedy (the examiner) said, I did not think we would have to be held liable—I might have misunderstood him—I understood him to say that it was being done, and that a note of that kind, if it was put in, we would. not personally be liable for it. * * * Yes, the bank was in bad condition at that time."

Again he says:

"I agreed after I understood that the payment of this money to Tayloe was for the benefit of the bank, to help the bank out. I agreed for the directors to put up this note to represent what money had been paid out, but I thought I was so agreeing in order to accommodate the bank. We were putting it up to represent the $6,758.90. It stated on the books of the bank that it represented the money that had been paid out, and the renewals were the same way. The Garland note was carried in the vault, that was the reason I was so anxious for the payment to come in. So far as the bank books were concerned it was never entered as an asset, the Shaw note stood for the asset, but the examiners knew all about it; they knew as much about the bank and its condition as we did."

McShane testified by deposition:

"I signed this note after the bank had paid the $6,758.90 to Tayloe. I never made any agreement with W. R. Garland that I would loan him my credit, or that I would become his surety for the payment of any amount of money that the Guaranty State Bank of Texarkana, Texas, might pay for Garland

to Lee Tayloe. The reason I executed and signed the $6,758.90 note was because it was supposed to be signed in order to protect the bank."

This witness also testified that he knew nothing about the execution of Garland's note and of its being carried in the vaults of the bank. He further stated that he did not at the time he signed the Shaw note know that the money had been paid out to Tayloe for Garland.

While the testimony quoted is only a part of what each of the witnesses stated on the trial, it is not in conflict with that which is not quoted. In my judgment, the record of the evidence, when considered in its entirety, conclusively shows the following facts:

First. That the payment of the bank's money to Tayloe by Shaw, while intended to be applied on Tayloe's claim against Garland, in order to prevent an immediate foreclosure of the superior lien against Garland's land, was not intended by any of the parties as either a direct or an indirect loan to Garland.

Second. That the bank's money was paid out and the loan approved in consideration of the Shaw note, and not upon the personal note later executed by Garland.

Third. That the Shaw note, and not the Garland note, was carried on the books of the bank as an asset of the bank and as a genuine representative of the money which had been paid out to Tayloe.

Unquestionably, Shaw was liable on that note, and it was so held in the original opinion, which was concurred in by my associates. That conclusion cannot be correct unless that note was the true consideration on which the money was loaned.

The only defense in this case being the want of a consideration, it devolved upon those relying upon that defense to prove the absence of all the elements which, in law, may constitute a valid consideration. The notes sued on are negotiable instruments and imply a consideration. Article 5933, R. S. 1925. The proof shows that the makers of the original note received no personal or private benefit from its execution. The money obtained from the bank was applied on a debt due from Garland to Tayloe in which the appellees and Shaw had no interest. That may be true, and still a legal consideration may be present. The test is: Was the promise evidenced by the original note the consideration or basis of the loan? It is immaterial how the money was applied, or for whose benefit it was procured and used. A note given for money borrowed for the sole benefit of a third party is based upon a valid consideration. Exum v. Mayfield (Tex. Civ. App.) 286 S. W. 481; Fleming v. Gamble (C. C. A.) 37 F.(2d) 72; German American State Bank v. Watson, 99 Kan. 686, 163 P. 637; Jewett v. Herr, 86 Ind. App. 392, 156 N. E. 568; Neylon v. Liberty Nat. Bank, 126 Okl. 188, 259 P. 545; Crothers v. Nat. Bank (Md.) 149 A. 270, and cases cited.

It is true the directors testified that they signed their names to the note for the accommodation of the bank, but they also stated that they did it to protect the assets of the bank. It is held in the Watson Case, above referred to, that: "Where a bank desires to make an additional loan to a customer, but cannot do so because it has already lent him as much as the law permits, and for that reason. induces another person to give his note for the amount, promising to hold him harmless in the matter, in legal contemplation the borrower, who receives the money, and not the bank, which pays it out, is the party for whose accommodation the note is signed."

It may be true that it was an accommodation to the bank for the directors to raise the money on their own credit, use it to satisfy Tayloe, and thus prevent a sacrifice of the bank's security for the Garland debt. But it was no accommodation to the bank to take its money, loan it to Garland, and give a sham note that was not enforceable to take the place of the money loaned to Garland. If those directors did what they testify they intended to do, accommodate and protect the bank, they must have intended to pledge their own credit for the repayment of the money used in satisfying Tayloe. They admitted that they signed the note with the intention and understanding that the note was to be carried on the books of the bank, as a part of its assets, and to take the place of the money paid out by Shaw. They had charge of the bank's funds and controlled the making of its loans. It was their duty to approve only such loans as were made on notes, or security, which they considered good. When they took notes for the repayment of loans, and carried them on the books of the bank as part of its assets, it will be presumed that such notes were genuine and enforcible obligations.

Article 527, Rev. Civ. Statutes, provides: "The board of directors of each bank organized under this title shall meet at least once per month and pass upon the business of the bank back to their previous. meeting, and shall keep a written record of its approval or disapproval of each loan. At each monthly meeting the records shall show the aggregate of the then existing indebtedness and liability of each of the directors and officers of the bank."

The preceding article expressly prohibits any officer of a state bank from becoming indebted to the bank in any sum without the consent of the board of directors.

In taking the bank's money and paying it to Tayloe, Shaw evidently had no intention

to misappropriate the bank's funds or to make a loan prohibited by law. The giving of his own personal note at the time clearly indicates that he intended to borrow the money upon his own credit and that of the directors, and not upon the credit of Garland. Although Shaw was an officer of the bank, he had a right, with the consent of the other directors, to borrow from the bank. While there is no evidence of the entry of a previous order by the directors, allowing Shaw to borrow money from the bank, the approval of the directors given afterwards is sufficient.

A loan of money is something more than the mere delivery of money by the owner to another. A loan is a contract wherein one party agrees to let another party have the use of a specific sum of money for a definite period of time in consideration of a promise by the borrower to repay with or without interest. Every such contract involves an agreement between at least two parties who are adversely interested. That proposition is so elementary that I would not here restate it except for the purpose of meeting some of the contentions urged in this case.

When Shaw, without previously consulting the other directors of the bank, took $6,758.90 of the bank's money, paid it to Tayloe, and gave his note to take the place of the money thus appropriated, that transaction did not constitute a loan, in a legal or commercial sense. The bank did not thereby become bound by the terms and stipulations expressed in the note to allow Shaw to retain the money for a definite period of time in consideration of the payment of the interest stipulated. Shaw, being the president of the bank, could not in such a transaction represent both himself and the bank. Nabours v. McCord, 100 Tex. 456, 100 S. W. 1152, 1155; Amarillo Nat. Bank v. Harrell (Tex. Civ. App.) 159 S. W. 858; Rogers v. First State Bank, 79 Colo. 84, 243 P. 637; State Bank v. Forsyth, 41 Mont. 249, 108 P. 914, 28 L. R. A. (N. S.) 501 and numerous cases cited in notes; 7 Corp. Jur. 541.

In the Nabours Case, cited above, the court said:

"In the case before the court the sale was made to McCord without the consent or knowledge of the beneficiaries in the trust, and logically the sale must be voidable at the election of the cestui que trust, because no man can make a contract with himself, and McCord, being agent and trustee for the creditors of the estate which he represented, did not have power to make a contract by which he would transfer the assets of that estate to himself."

In a legal sense, the bank was not present when Shaw took the money in order to give its assent to what its agent did. The bank had only a legal existence and could act only through its officers and agents. No other agent was present on that occasion to speak or act for the bank. An agent cannot, in a transaction where he is personally and adversely interested, represent both himself and his principal.

Hence the act of Shaw in paying out the bank's money to Tayloe and the placing of his note in its stead as a part of the bank's assets did not become a contract binding on the bank till that transaction was approved by the board of directors. Those directors could have refused to accept the note and approve the loan, and might have demanded of Shaw the immediate return of the money which he had thus appropriated. But the evidence shows that they did approve what Shaw had done, and the note thereby became a binding contract with the bank. The question then arises: Upon what conditions did the directors approve that transaction as a loan? Did they accept Shaw's note with or without their own signatures? If they accepted Shaw's note unconditionally and without their own signatures, and after such acceptance signed the note purely as a gratuity, and not in the discharge of any duty they owed the bank, then it may be that they could claim that there was no legal consideration for their promise to pay the debt.

In the original opinion it was said that the directors other than Shaw were not liable because the bank had parted with the money some time before those directors signed the note. That conclusion, however, was based upon the theory that the original transaction was an indirect loan to Garland, and for that reason was an unlawful use of the bank's money for which Shaw alone was responsible. I now think that conclusion is incorrect even upon that theory of the case. I have no doubt of its incorrectness if the Shaw note was the real consideration upon which the money was originally paid out. Upon the latter theory that transaction was not illegal or morally wrong. On the contrary, it was within the power of the bank officials and was morally a praiseworthy effort on their part to prevent a sacrifice of the property upon which their bank held a second lien.

There is in this case no evidence that the note was approved by the directors without their signatures. They seem to have intended to affix their names to the note at the time they approved the loan. The evidence is undisputed that they signed the note for the purpose of "protecting the bank," and with the understanding that the note was to be carried as a part of the bank's assets, taking the place of the money which had been paid out.

This original Shaw note, after being signed by the directors, was not only listed and carried as a part of the bank's assets till its maturity, but was renewed and the renewals

likewise carried as assets of the bank till the bank was closed in February, 1924. On the other hand, Garland's note given for the same amount of money was locked in the bank's vault, never exhibited as a part of its assets, and never renewed, although it must have been long past due at the time the bank failed:

Shaw and his associate directors were not dealing with the bank at arm's length. They were not only the agents through whom the bank's affairs were conducted and its funds loaned, but they were the custodians of those funds. The law will not permit them to profit by any transaction with the bank in which they were personally concerned, nor should they be permitted to deny their liability on any promise they made for the protection of the funds entrusted in their keeping. What they did in order to protect the bank's assets or to secure the loan of its money must be presumed to have been prompted by a sense of duty and as something necessary for the protection of the property in their custody. After the bank has failed with the loan which they guaranteed still unpaid, those directors should not be heard to say that their signatures were unnecessary and not the basis or consideration upon which the loan was approved by them. Who can say for the bank that the loan was accepted, or was an acceptable one, without the signature of those directors? To allow them to do so in this case, and under the state of facts disclosed in the record before us, would be to permit them to take advantage of their fiduciary relations to the bank and the privacy which attended that transaction, in order to defeat what is, apparently at least, a valid obligation to the bank. The temptation to perpetrate fraud against the bank is, under such circumstances, too great. As before stated, the bank was a mere legal entity and could assent or dissent only through its officers, and there were on that occasion no other representatives through whom the bank could express itself. When an agent loans funds of his principal and personally endorses the note, the note is binding upon the agent when it is accepted by the principal or by some other agent representing the principal.

There is another reason which I think justifies the holding that the original Shaw note, afterwards signed by other appellees, was based upon a valid consideration. The record shows that when the Guaranty State Bank was incorporated, N. A. Shaw, R. W. Rodgers, and J. P. McShane owned 415 of the 500 shares of its stock. Ghio, Trigg, and Rochelle must have acquired their stock some time after the bank's organization and before this original transaction occurred. It is probable that N. A. Shaw and the other appellees who were directors owned a large majority, if not practically all, of the bank's

stock at the time the Shaw note was executed in 1922.

The evidence also shows that at that time the bank was in a bad financial condition. Evidently its capital stock had been impaired or reduced. Article 365, R. C. S. of 1925, provides:

"Whenever the Commissioner shall have reason to believe that the capital stock of any banking corporation subject to the provisions of this title is reduced by impairment or otherwise below the amount required by law or by its certificates or articles of association, he shall require such corporation to make good the deficiency."

What the shareholders may be required by the commissioner to do, they may voluntarily do in order to keep the bank from closing. A note executed for that purpose by the shareholders is based upon a valid consideration and becomes a binding obligation. Farmers Co-operative Union v. Reynolds, 127 Kan. 16, 272 P. 108; Whiteman v. Bishop (Tex. Civ. App.) 289 S. W. 730. While there was no formal demand upon the shareholders or directors of this bank to strengthen its capital stock, and there was no meeting of the shareholders formally held for that purpose, the evidence conclusively shows that in signing the Shaw note the purpose of the signers was "to help the bank from closing," "to protect the bank's assets." What does that mean except to strengthen the bank's financial condition after the payment of its money to Tayloe? The evidence also shows that about that time the bank was compelled to borrow money from a bank at Dallas in order to meet the demands for cash.

It may be contended that in this instance the directors had a right to expect that this Shaw note should be paid out of the collections from Garland, and for that reason they were not personally liable. Under our present Negotiable Instruments Law (Rev. St. 1925, art. 5932 et seq.) that defense is not available. Whiteman v. Bishop, supra; Steinfeld & Co. v. Tew (Ariz.) 274 P. 1047; Smith v. Bennett (Ga. App.) 154 S. E. 289.

If the original Shaw note was based upon a valid consideration, then it logically follows that all renewals of that note are also based upon a legal consideration.

After a careful examination of the facts, I have concluded that the appellees should now be estopped to say that they are not liable on the notes sued on, and that the trial court should have instructed a verdict for the bank commissioner, or he should have rendered a judgment in favor of the commissioner upon the findings of the jury.

Since the majority of the court adhere to the conclusions stated in the original opinion, the motion must be overruled.