607 So.2d 76 (1992)
OMNIBANK OF MANTEE and James R. Gray
v.
UNITED SOUTHERN BANK, Phillip Kantor and John B. Lowery.
No. 89-CA-0614.
Supreme Court of Mississippi.
Decided July 29, 1992.
Rehearing Denied August 26, 1992.
*78 Grady F. Tollison, Jr., S. Allan Alexander, Tollison Austin & Twiford, Oxford, Heidelberg & Woodliff, Jackson, John W. Dulaney, Jr., Tunica, for appellants.
John H. Dunbar, Jack F. Dunbar, Holcomb Dunbar Connell Chaffin & Willard, Oxford, Winn Davis Brown, Jr., Southaven, Roger A. Stone, Memphis, Tenn., William F. Travis, Southaven, William H. Thomas, Jr., Memphis, Tenn., for appellees.
Before DAN M. LEE, P.J., and ROBERTSON and SULLIVAN, JJ.
ROBERTSON, Justice, for the Court:

I.
This appeal arises from a branch bank officer's imprudent credit practices, only days after the branch opened with assets purchased from another parent bank. Problems of corporate governance are present as well, some of which arise incident to the branch bank president's divided loyalties between the selling and buying parent banks. The Chancery Court awarded the buying parent bank a substantial personal judgment against its former officer, attributable largely to three sizable credits turned sour. The Court held the selling bank as well on two of the bad credits. We affirm the judgment against the officer but reverse and render that against the selling bank.

II.

A.
Our principal players are three in number, two parent banks and the officer who managed the branch one bank sold the other and who served first the selling bank, served both during a five-month transition period and, finally, served the buying bank for some nine months post-consummation.
Omnibank Of Mantee is a state-chartered banking association having its principal office in Mantee, Webster County, Mississippi, whose official name at all times relevant hereto was Bank Of Mantee ("BOM"). At all times relevant here, BOM's president was Jerry Ishee, and Woodrow W. Martin, Jr., was chairman of its Board of Directors. BOM's deposits were insured with the Federal Deposit Insurance Corporation ("FDIC"). BOM was the selling bank and was one of the Defendants below and is one of the Appellants here.
United Southern Bank ("USB") is a state-chartered banking association, having its principal place of business in Clarksdale, Coahoma County, Mississippi. USB has five branch banks in Coahoma County and branches as well in Lafayette, Quitman, Panola, Sunflower, Tallahatchie and Tate Counties. At all times relevant hereto, USB's President and Chief Executive Officer was C. Willis Connell, Jr. Willis L. Frazier and Edward P. Peacock, III, each served as Senior Vice President. USB's deposits were FDIC insured. USB was the buying bank and was the Plaintiff below and is the Appellee here.
Prior to 1982, Peoples Bank and Trust Company independently engaged in the banking business at 8975 Goodman Road in Olive Branch, DeSoto County, Mississippi. In 1982, BOM acquired Peoples and operated it as a branch bank, keeping the trade name of Peoples Bank and Trust Company, for convenience sometimes referred to as "the Branch." James R. Gray came *79 aboard Peoples' banking staff in 1981 as an assistant branch manager and loan officer. BOM promoted Gray to president of the Branch in May of 1982. In January of 1983, Gray was elected to BOM's Board of Directors. Gray remained in these capacities through and including July of 1984 when USB acquired most of the Branch's assets and liabilities, and on into April of 1985. To be specific, on June 30, 1984, Gray resigned as an officer and director of BOM. On July 2, 1984, USB formally hired Gray and installed him as president of the Branch, a position Gray resigned on March 21, 1985, effective April 4, 1985. Gray was one of the Defendants below and is one of the Appellants here.
But back up to January of 1984, BOM, having problems of its own, sought to sell the Branch. USB was interested in expanding into the economically prosperous DeSoto County area. The two began negotiations regarding their respective interests, and on January 13, 1984, USB made a bid to purchase most Branch assets, consisting mainly of loans and fixed assets, and to assume liabilities consisting mainly of the customer deposit base. BOM accepted this bid, and on January 30, 1984, the parties entered into a written buy-sell agreement. On March 7, 1984, BOM, as seller, and USB, as purchaser, formally applied to the FDIC for approval of the transaction.
USB had acquired at least eleven branch banks in recent decades and had found it advantageous to retain the branch presidents as USB's branch managers after the acquisition, for reasons ranging from community goodwill to continuity of operations. These thoughts in mind, USB independently inquired of Gray's qualifications and, upon the yield of this inquiry and Gray's obvious familiarity with the Branch and its operations, decided to keep Gray on the job. On February 1, 1984, USB and Gray agreed in principle that, when FDIC approval was obtained and the transaction closed, USB would retain Gray as president and managing officer of the Branch. The parties so represented in the FDIC application, providing that an inducement for the transaction was that Gray would remain at an increased base salary.
The sale ultimately closed on July 2, 1984, and BOM ceased all banking operations based in the Olive Branch area. Prior to that time, Gray remained a compensated officer of BOM. During the period February 1 through July 2, 1984, however, Gray worked closely with USB personnel, who were often in the Branch, in their evaluation of the assets and liabilities of the Branch and in generally familiarizing USB personnel with the details of the Branch's business. Beyond dispute, during this time Gray was serving two masters, with full disclosure and consent of all.
During this post-agreement period, USB carefully sifted through all of the branch's outstanding loans and had determined to purchase loans aggregating about fourteen million dollars. USB set aside and did not assume loans aggregating $1,014,855.77, regarded by USB as bad risks. These loans remained on the BOM books. Nor did USB designate for assumption any contingent liabilities. This becomes important, for at the time USB was deciding which loans it would assume, BOM had outstanding two letters of credit, one issued for the benefit of John B. Lowery, Phillip Kantor and Charles S. Riggan ("LK & R") and a second for the benefit of Jess Bigelow. As it was not assuming any contingent liabilities, it is not clear USB was even aware of these two letters of credit. USB's non-assumption decision suggests no adverse view at that time of the worthiness of these credits.
USB affords all of its branch banks substantial autonomy. Under the new regime, Gray had complete charge of the day-to-day banking business of the Branch. He had discretionary loan authority, subject to USB's limits for all senior loan officers: $75,000.00 for unsecured loans; $150,000.00 for secured loans. Within two months of July 2, 1989, Gray had exceeded this authority, and much more, and the seeds of this civil action had been sown.

1. Lowery, Kantor and Riggan Transactions
Before USB ever appeared, Lowery, Kantor and Riggan ("LK & R") banked *80 with the Branch, and Gray had been the principal officer with whom they dealt. Lowery and a partner owned the Belvedere Apartments in Memphis, Tennessee. Lowery, Kantor and Riggan were also involved in a substantial condominium development in Memphis known as Wagner Place.
In November of 1983, Gray issued BOM's letter of credit for the benefit of LK & R in the sum of $400,000.00, understanding that LK & R would deliver the letter to First South Savings and Loan Association of Pine Bluff, Arkansas, ("First South") as part security for financing outstanding loans regarding the Belvedere Apartment Building. The letter obligated BOM to pay First South upon the latter's written representation the $3,200,000.00 purchase money loan First South held on Belvedere was in default. In the late Spring of 1984, First South called the Belvedere letter of credit. BOM undoubtedly was obligated, and Gray honored the letter of credit on June 5, 1984, wiring First South $400,000.00 of BOM funds. Lowery and Riggan assured Gray the $400,000.00 would be repaid shortly  a matter of weeks but certainly before the pending sale to USB  either from the half million dollar surplus on the Wagner Place construction loan or from the anticipated sale of the Belvedere. June 26, 1984, arrived, and the debtors had produced no funds. On that date, Gray had Lowery, Kantor and Riggan formalize the debt by giving BOM their ninety day note in the principal sum of $400,000.00, payable on September 4, 1984, with interest at fourteen percent per annum.
Sometime near the end of June, Gray told Woodrow W. Martin, Jr., chairman of the Board of the Bank of Mantee, about the Lowery/Kantor/Riggan matter and said the funds would be shortly repaid or, if necessary, once USB took over, he would make Lowery, Kantor and Riggan a new loan, so they could repay BOM. There is no evidence that Martin[1] told anyone about the conversation with Gray, including Jerry Ishee, BOM's president.
Three weeks after USB had acquired the Branch and Gray had become USB's Branch president, on July 23, to be exact, Gray wired $407,210.96 from USB to BOM, the $7,210.96 representing interest from June 5, the day BOM paid First South, until July 23, 1984. The record is silent whether Lowery, Kantor or Riggan requested the wire, or a USB loan to repay BOM. It appears Gray moved the loan to USB on his own initiative. He sought no approval from higher authority within USB for these credit extensions that so obviously exceeded his authority. Of the $407,211.96, BOM credited $400,000.00 to its commercial loans general ledger account and $7,210.96 to its interest general ledger account. LK & R's June 26 note to BOM had been paid in full. On July 27, four days after wiring BOM the money, Gray had Lowery, Kantor and Riggan each give USB his note for $150,000.00, for an aggregate of $450,000.00. Each cross-guaranteed the notes of the others. These notes were backdated to July 23 and were otherwise unsecured. The $42,789.04 difference ($450,000.00  $407,210.96 = $42,789.04) was deposited in Riggan's checking account.[2] Each man considered the notes valid at that time and expected to pay them.
USB subsequently renewed each of the three notes at least twice. USB ultimately recovered some money, but applied this to other obligations of these borrowers. The respective LK & R notes have been "charged off" in full. Through October 17, 1988, LK & R's unpaid balance was $607,539.03, principal and interest.

2. Jess Bigelow Letter of Credit
Jess Bigelow was a longstanding customer of the Branch with a favorable loan repayment history. In early 1984, Bigelow organized the Visitors' Information Center *81 and planned to build informational booths along the routes leading to the Louisiana World's Fair. Bigelow sought financing for his venture through Walter E. Heller & Company. Heller required that Bigelow provide security in the form of a $100,000.00 letter of credit issued by an acceptable banking institution. Bigelow turned to Gray and asked that the Branch provide his security. On January 23, 1984, Gray issued a BOM letter of credit in Heller's favor and in the amount of $100,000.00, good for one year, taking in turn no collateral or security therefor.[3]
As fate would have it, Visitors' Information succeeded no better than the Fair itself. Bigelow began missing his monthly payments to Heller, and Heller threatened demand on the letter of credit. To forestall Heller, Gray, now acting through USB, began a series of loans to Bigelow. By January of 1985, Gray had made Bigelow new USB unsecured loans aggregating $61,857.40, much of which had been sent to Heller. On or about January 12, 1985, some ten days before the BOM letter expired, Gray issued a new USB $100,000.00 letter of credit to Heller for Bigelow's benefit. Gray had authority from USB to make unsecured loans not in excess of $75,000.00. He sought no approval before giving the new letter of credit.
Heller subsequently called the new letter of credit, forcing USB to pay the $100,000.00. USB obtained an unsecured note from Bigelow in exchange for payment to Heller, but Bigelow defaulted. USB elected to sue Bigelow and obtain a default judgment to pursue collection, but without success.

3. Piecara Loans
Frank Piecara was another established customer of the Branch. In 1984, Piecara was president of Mirage Construction, Inc., an Arizona corporation. He also was trustee for a trust created for his children, known as the "Piecara Trust." Piecara apparently did business under various trade names. In May of 1984, Mirage entered into a subcontract with Rogers Construction Company for earthwork and roadwork at the Picacho Pumping Plant in Arizona. Beginning July 2, 1984, and within six weeks thereafter, Gray extended ten loans in the aggregate principal amount of $536,000.00 to the Piecara Trust, primarily for working capital for Mirage. In addition, Gray issued a $300,000.00 irrevocable letter of credit. BOM has no involvement here.
The $300,000.00 letter of credit was issued to Rogers Construction, to secure Mirage's performance as Rogers' subcontractor. As security for the loans and the letter of credit credit, Gray took Mirage's accounts and contract rights, particularly all payments Piecara might earn via the subcontract. The value of the collateral turned on Mirage's satisfactory performance of his subcontract and, of course, on a solvent prime contractor. Gray neglected to perfect USB's security interest in the subcontract, nor did he notify the property owner or the prime contractor of USB's interest. Gray did not require the contractor or owner to remit subcontract payments directly to USB.
As to the $300,000.00 letter of credit, Gray did call Edward P. Peacock, III, Senior Vice President in Clarksdale, and request authorization. The record is unclear how much information Gray gave Peacock about the proposal and how much Peacock requested. Gray and Peacock each had $150,000.00 authority to make secured loans, and the two combined their authority to issue the letter of credit. We do know that Piecara and his companies defaulted and USB took a substantial loss. USB managed to recover $631,160.50 owed by Piecara, but had charged off the principal sum of $582,808.67.

*82 B.
On November 7, 1985, USB commenced the present civil action by filing its Complaint in the Chancery Court of DeSoto County, Mississippi. Following several amended complaints, Gray and BOM, by this time Omnibank of Mantee, stood as the principal defendants. USB charged that, with respect to the Lowery, Kantor and Riggan, Bigelow and Piecara transactions, Gray had advanced imprudent credits and loans and had breached fiduciary duties owed USB. The complaint demanded of Gray damages for all of USB's losses on these accounts, plus attorneys fees and costs. USB charged BOM with unjust enrichment flowing from Gray's breach of his fiduciary duties regarding the LK & R and Bigelow credits and demanded restitution.[4]
After considerable discovery and plenary trial on the merits, the Chancery Court held for USB on all issues and on February 21, 1989, entered judgment for USB and against Gray in the amount of $911,904.93, plus an additional $159,181.47 in attorneys' fees and expenses. Beyond this, arising out of the LR & K and Bigelow transactions, the Court entered judgment in favor of USB and against Gray and BOM, jointly and severally, for $672,855.97.
Gray and BOM now appeal to this Court.

III. SCOPE OF REVIEW  WITH A TWIST
Where, as here, a trial court sits without a jury and makes findings of fact, these ordinarily are safe on appeal where the record includes substantial supporting evidence. Norris v. Norris, 498 So.2d 809, 814 (Miss. 1986), Gilchrist Machinery Co., Inc. v. Ross, 493 So.2d 1288, 1292 (Miss. 1986), Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983), Culbreath v. Johnson, 427 So.2d 705, 707-709 (Miss. 1983). This is true whether the findings relate to matters of evidentiary fact or ultimate fact. Dudley v. Light, 586 So.2d 155, 159 (Miss. 1991); Norris, 498 So.2d at 814; Gilchrist, 493 So.2d at 1292, Spain v. Holland, 483 So.2d 318, 320 (Miss. 1986). This Court on review examines the entire record and must accept:
that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom... .
Cotton, 435 So.2d at 685. Ordinarily, this Court must affirm a finding of fact unless upon review of the record we be left with the firm and definite view that a mistake has been made. UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, 525 So.2d 746, 754 (Miss. 1987); Harkins v. Fletcher, 499 So.2d 773, 775 (Miss. 1986); Dillon v. Dillon, 498 So.2d 328, 329 (Miss. 1986).
Not infrequently a trial court fails to make all of the findings reasonably prerequisite to its judgment. Where this is so precedent and prudence counsel we interpolate from the findings made and assume the trial court resolved the remaining issues consistent with the judgment. PMZ Oil Company v. Lucroy, 449 So.2d 201, 205 (Miss. 1984); Cotton v. McConnell, 435 So.2d at 685; Harris v. Bailey Avenue Park, 202 Miss. 776, 791, 32 So.2d 689, 694 (1947). These implied findings are protected by the substantial evidence rule the same as express findings. Spain v. Holland, 483 So.2d at 320; Bryant v. Cameron, 473 So.2d 174, 179 (Miss. 1985). Of course, none of this should be taken to say we will make up findings simply to support a judgment. Riddle v. State, 580 So.2d 1195, 1200 (Miss. 1991); Tricon Metals & Services, Inc. v. Topp, 516 So.2d 236, 238 (Miss. 1987); Pace v. Owens, 511 So.2d 489, 492 (Miss. 1987).
Today's are not ordinary findings. The Chancery Court literally signed off on USB's proposed findings of fact and conclusions of law. Not one word has been *83 changed.[5] We have confronted this form of findings before.
Without doubt, the Chancery Court in gross ruled for USB and against Gray and BOM. Our concern is we have been handed a twenty-three page document detailing numerous findings of evidentiary and ultimate fact with the law thereafter declared and applied, and nothing before us suggests any of this except in broad outline is the product of the Court's adjudicatory prowess. The practical premise underlying our limited review of matters of fact is that the trial court heard the testimony and observed the demeanor of witnesses and from this made the tough and necessary credibility choices. That predicate premise does not obtain today, and so we have no choice but to "engage in much more careful analysis of adopting findings than in cases where the findings and conclusions have been authorized by the trial judge himself." Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1265 (Miss. 1987). We must keep a keen eye for gratuitous slants. Common sense suggests our duty of "deference to such findings is necessarily lessened." Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1266 (Miss. 1987). At the very least, we may assume such findings have given the party drafting them the benefit of the favorable inferences that may be found in the facts. Findings that tend against the drafting party would seem as solid as can be. We do not wish to appear insensitive to the burdens the trial court carries. The course chosen here increases the burden on this Court as an appellate court, and we "must view the challenged findings of fact and the appellate record as a whole with a more critical eye to insure that the trial court has adequately performed its function." Rice Researchers, 512 So.2d at 1265; see also, Tricon Metals & Services, Inc. v. Topp, 516 So.2d 236, 239 (Miss. 1987).
Some of the issues tendered for review are not of fact but of law. We approach these matters with an altogether different attitude. Our review is de novo. Watts v. Pennington, 598 So.2d 1308, 1311 (Miss. 1992); Rose v. State, 586 So.2d 746, 751 (Miss. 1991); State of Mississippi v. Aseme, 583 So.2d 955 (Miss. 1991); Harrison County v. City of Gulfport, 557 So.2d 780, 784 (Miss. 1990); Cole v. National Life Insurance Co., 549 So.2d 1301, 1303 (Miss. 1989); UHS-Qualicare v. Gulf Coast Community Hospital, 525 So.2d 746, 754 (Miss. 1987); Boggs v. Eaton, 379 So.2d 520, 522 (Miss. 1980); see also Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66, 79 (1982). This Court,
as a matter of institutional necessity and constitutional imperative, is the ultimate expositor of the law of this state. Notwithstanding our respect for and deference to the trial judge, on matters of law it is our job to get it right. That the trial judge may have come close is not good enough.
UHS-Qualicare, 525 So.2d at 754.
Each of these principles, each of these attitudes, aids our approach to the appeals we must adjudge.

James R. Gray's Appeal

IV. GRAY QUA USB'S "OFFICER"
The Chancery Court found Gray was an officer of USB from and after July 2, 1984, and by reason thereof owed certain duties to USB, some of which are fiduciary in nature. This holding is the cornerstone of the legal analysis which led ultimately to judgment against Gray. Gray argues that the Court erred in this, pointing to the fact that he was certainly not an officer in the sense that USB's Board of Directors had elected him. Gray insists rather that he was a mere salaried employee.
*84 The law devolves upon those in the upper echelons of a corporate entity certain duties owing to the entity, over and above those of an ordinary agent or employee, and the question is whether Gray was one of those so burdened. We doubt a definitional line may be drawn with precision or permanence. For the moment, we are prepared to accept that
"Officer" means (a) the chief executive, operating, financial, legal and accounting officers of a corporation; (b) to the extent not encompassed by the foregoing, the chairman of the board of directors . .., president, treasurer, and secretary, and a vice-president or vice-chairman who is in charge of a principal business unit, division, or function . .. and (c) any other individual designated by the corporation as an officer.
American Law Institute, Principles of Corporate Governance: Analysis and Recommendations, § 1.27 (Proposed Final Draft 1992) (emphasis added) (hereinafter "Principles of Corporate Governance, § ____"); see also, Hill v. Southeastern Floor Covering Company, Inc., 596 So.2d 874, 876 (Miss. 1992).
His title aside, Gray served USB from and after July 2, 1984, as the chief operating official at the Branch where he had substantial discretionary authority. We think a banking office such as the Branch as one of USB's principal business units. Of those on the scene, Gray was the man in charge. He presided over a branch worth over twenty million dollars, had substantial loan authority, and had considerable autonomy in directing the day-to-day operations of the branch. The Court below was correct in treating Gray as an officer of USB.

V. OFFICER GRAY'S DUTIES TO USB

A. Gray's Duty of Care
By law, officer Gray owed USB two principal duties: a duty of care and a duty of loyalty and fair dealing. These duties differ in nature and content, though they doubtless intersect and overlap. The law demands these duties of bank officers the same as officers of other corporations, and there is a bit of lore born no doubt of thought of failed banks and helpless widows that we ought demand more of bank officers than one who runs a foundry or a pest control company. See 1 Malloy, The Corporate Law of Banks, § 3.2.6, n. 1 (1988); 10 Am.Jur.2d, Banks, § 172, p. 161 (1963).
We begin with the duty of care, which we find appropriately articulated as follows:
A director or officer has a duty to the corporation to perform the director's or officer's functions in good faith, in a manner that he or she reasonably believes to be in the best interests of the corporation, and with the care that an ordinarily prudent person would reasonably be expected to exercise in a like position and under similar circumstances... .
(1) The duty in Subsection (a) includes the obligation to make, or cause to be made, an inquiry when, but only when, the circumstances would alert a reasonable director or officer to the need therefor. The extent of such inquiry shall be such as the director or officer reasonably believes to be necessary.
Principles of Corporate Governance, § 4.01(a). See Derouen v. Murray, 604 So.2d 1086, 1092 (Miss. 1992).
We long ago recognized this duty in a banking setting and said an officer who "very negligently" makes unreasonably risky loans may on his borrowers' default be held personally to make good the bank's loss. Boyd v. Applewhite, 121 Miss. 879, 908-09, 84 So. 16, 26 (1920). Today, we accept that a loan officer has broad discretion but in exercising that discretion he must reasonably assess a risk and, if he fails in this, may expect to have each loan judicially scrutinized for borrower solvency, responsibility and adequate security. 1 Schlichting, Rice, Cooper, Banking Law, § 6.15, pp. 6-86 (1989).
An agent is liable to his principal for losses proximately caused when the agent substantially deviates from his principal's instructions. The same rule applies to bank loan officers. Shaw v. McShane, *85 33 S.W.2d 277 (Tex.Civ.App. 1930). An officer who violates substantially his bank's loan policies and lending limits may be held for losses caused thereby. Mechem on Agency, § 1295, p. 939 (2nd Ed. 1914).
All of this is informed by the customs and usages of the banking community, 1 Schlichting, Rice, Cooper, Banking Law, § 6.15[9], pp. 6-102 (1989), and in this we understand the admonition that bank officers are held to a higher duty of care than the officers of other corporations. Banking customs and usages flesh out "a like position and under similar circumstances" within the duty.[6]See Hoehn v. Crews, 144 F.2d 665, 673 (10th Cir.1944). His faults so measured, the officer is accountable for the losses they cause. Bates v. Dresser, 251 U.S. 524, 531, 40 S.Ct. 247, 249, 64 L.Ed. 388, 395 (1920).
A person charging an officer with breach of his duty of care has the burden of production and persuasion on the issues of breach, cause, and damage to the corporation. Principles of Corporate Governance, § 4.01(d).
The duty of care is subject to a well-settled common law defense, known as the business judgment rule. That rule has recently been stated with care:
A director or officer who makes a business judgment in good faith fulfills the duty ... [of care] if the director or officer:
(1) is not interested ... in the subject of the business judgment;
(2) is informed with respect to the subject of the business judgment to the extent the director or officer reasonably believes to be appropriate under the circumstances; and
(3) rationally believes that the business judgment is in the best interests of the corporation.
Principles of Corporate Governance, § 4.01(c). See Miss. Code Ann. § 79-4-8.42 (rev. 1989); see also, Home Telephone Company v. Darley, 355 F. Supp. 992, 1000 (N.D.Miss. 1973). As with the duty itself, the business judgment rule imports an objective standard.
Regarding Gray's duty of care to USB, the Chancery Court found, via USB's drafting services:
24. Gray's loan limit as the president in charge of the Branch was $75,000.00 in aggregate unsecured loans, and $150,000.00 in aggregate secured loans to any one borrower; hence, the three $150,000.00 unsecured LR & K loans and the unsecured $100,000.00 Bigelow letter of credit exceeded Gray's lending authority.
25. While Gray denies that anyone specifically told him what his loan authority was on and after July 2, 1984, the Court finds that due to his position of trust and because of his experience in lending, audit and operations, if Gray did not know, he was obligated to know and should have known the extent of his lending authority before advancing any loan to anyone. The Court's finding regarding a bank officer's duty "to ask" is supported factually by the testimony of every banker/witness, other than Gray, who testified at trial, including Mr. Ishee, an officer of ... [BOM].
.....
29. USB's banking expert, Mr. Ed Neeley, opined that Gray's handling of the Piecara transactions violated sound banking practices and was imprudent. Mr. Neeley testified to the same effect, about the LR & K and Bigelow transactions. Mr. Neeley's opinions were uncontradicted. The Court notes significantly that no "experts" testified in justification of Gray's conduct in any of the three transactions in this case. The Court accepts Mr. Neeley's testimony as credible and agrees with the opinions advanced at trial.
From these findings, the Chancery Court held Gray had breached his duty of care.

*86 The Court can only conclude that Gray negligently extended credit to Messrs. Bigelow, Lowery, Riggan, Kantor and Piecara ... when he knew or should have known these men were insolvent, in the sense they could not pay their debts when due. Moreover, he took no collateral whatsoever and violated USB's loan policy.

1. Lowery, Kantor and Riggan
The evidence supporting these findings regarding Gray's handling of the LK & R transactions in July of 1984 is quite substantial. It will be recalled that on June 5, 1984, acting for BOM, Gray honored the LK & R letter of credit and paid the $400,000.00 to First South. On June 26, 1984, LK & R executed a $400,000.00 unsecured note payable to BOM maturing on September 4, 1984, with interest at date at fourteen percent per annum. This note was outstanding on July 2, 1984, and was not assumed by USB. Because it was in conditional liability/letter of credit form at the time USB was reviewing Branch loans, it was not considered for purchase, although, in fact, USB had designated for purchase certain other individual loans of Lowery and Riggan.
What is critical is that on July 23, 1984, James R. Gray, in his new capacity as president of USB's Branch, determined that he would transfer the LK & R loan to USB by paying BOM and obtaining new notes from LK & R in favor of USB. There is substantial evidence that at the time, Gray knew, or reasonably should have known, that Lowery, Kantor and Riggan were in financial distress and were likely unable to meet their obligations in a timely fashion. See, e.g., Miss. Code Ann. § 75-1-201(23) (rev. 1989) (defining insolvency). Evidence undergirding this conclusion included that the Lowery-and-Riggan-guaranteed $3,200,000.00 Belvedere loan with First South was in default in June of 1984. At the time Gray honored the BOM-to-First South letter of credit, Lowery, Kantor and Riggan had represented they would repay BOM the $400,000.00 within a few weeks. That they were unable to do so should have told Gray something. Moreover, Gray knew that Lowery, Kantor and Riggan had guaranteed the $15,350,000.00 Wagner Place loan with First South, which was then in default, liabilities for which were not reflected on the financial statements of either of them. Gray further knew that some $1,200,000.00 in unsatisfied materialmen's and other construction liens had been placed against the Wagner Place project in Memphis, thus halting that project's sale and development, as well as LK & R's cash flow. Notwithstanding, Gray unilaterally and without authority loaned LK & R unsecured $450,000.00 of USB's funds.
The LK & R notes were not paid when due, and USB renewed them several times. In the USB-drafted findings of fact, the Court found that
Despite reasonable collection efforts, at the present time the respective $150,000 notes to Lowery, Riggan, and Kantor, aggregating $450,000.00 plus interest, are unpaid and have been "charged off" in full. Money has been collected from each borrower but has been applied in accordance with the law or the borrower's instructions to earlier obligations of the borrowers to USB. The unpaid principal remains $450,000.00. Interest at the prime rate is $157,539.03 through October 17, 1988. The total debt is $607,539.03.
Later, the Court somewhat gratuitously holds Gray's "acts ... reckless[[7]] and tantamount to gross negligence" as a predicate to assessing Gray with USB's attorneys fees and legal expenses. For the moment, we find no grounds for disturbing the Chancery Court's conclusion that, in his *87 handling of the LK & R matter, Gray breached his duty of care, causing USB a substantial loss.

2. Bigelow
Gray says he did not know if USB selected the Bigelow letter of credit when it was selecting the loans to purchase. BOM's President Ishee and CEO Martin handled those matters; Gray did not. Gray kept the letters of credit in a file behind his secretary's desk. He had no discussions with USB's higher ups about letters of credit. When Bigelow fell into arrears on his payments to Heller, he approached Gray. On July 31, 1984, Gray made Bigelow an unsecured loan of $20,000.00 and wired $12,830.00 to Heller, which was more than due. Gray says he was relying on Bigelow's mother's property in Kentucky and an inheritance from his grandmother, but did not verify these properties. In October, Gray loaned Bigelow another $20,000.00 unsecured, knowing the land in Kentucky was not attached. By January these unsecured loans totaled $61,857.40.
Our principal concern is the new $100,000.00 letter of credit Gray had USB issue without security on January 11, 1985. Gray says he did this because Heller asked him to do so. He was worried Heller was going to call in the BOM letter of credit. "I issued the [new USB] letter of credit because there was a possibility it would be called, but I issued the letter from USB with the assumption that if it was called then USB would have to pay it." Gray did not clear that assumption with anyone at USB. He just did it. The evidence is more than adequate that Gray breached his duty of care in handling the Bigelow matter, causing USB substantial losses.

3. Piecara
Gray's defaults in the Piecara loans are equally apparent. To be sure, there is nothing per se improper about a banker securing a credit by taking a security interest in contract rights or an assignment of accounts or the like.[8] We are unimpressed with USB's constant carping that such collateral was "worthless until Piecara performed" and that Gray was somehow supposed to have confirmed that Piecara had earned payments under his subcontract before he "released loan proceeds." On the other hand, there are risks associated with this receivables form of collateral not associated with more tangible security, and a prudent loan officer must reasonably assess and control these risks. These risks are exacerbated where, as here, the subcontract is to be performed some 1500 miles away.
Here Gray's defaults become apparent. He made no inquiry of the financial responsibility of the prime contractor or the owner. A prudent loan officer taking such collateral will give notice of his bank's interests to the prime contractor and the owner and demand that all payments due under the subcontract be routed through the bank. Gray did none of this, nor did he monitor performance of the subcontract and have Piecara remit as his company was paid. Gray failed to perfect USB's security interest, a matter no doubt controlled by the Uniform Commercial Code as enacted in Arizona and any other applicable jurisdiction. Moreover, it appears clear the value of his collateral was far below what prudently should have been required for a credit of this size. We accept the Chancery Court's holding Gray breached his duty of care to USB in handling the Piecara loans.

B. Gray's Defenses

1. The Business Judgment Rule
Gray's argument in reply is laced with implied references to the business *88 judgment rule. He insists he acted in subjective good faith at all times, and of this there is little doubt. USB does not seriously contend otherwise. The Chancery Court in effect found Gray had no "interest" in any of the credits at issue. See Principles of Corporate Governance, § 1.23. He points to reasonably current financial statements of the several debtors and beyond these to his personal knowledge of their backgrounds and circumstances. Gray reminds us as well all of these credit extensions  to LK & R, Bigelow and Piecara  were reflected on USB's internal records which his superiors were charged to review, implying they found nothing wrong with his business judgments until things turned sour. Gray insists he reasonably believed all five debtors would respond to their obligations in a reasonably timely fashion.
Beyond this, Gray makes a more practical plea. It begins by reminding us that Lowery, Kantor, Riggan, Bigelow and Piecara were all established customers and borrowers at the Branch before USB first talked to BOM about the purchase. He tells us further USB selected and assumed nine other loans to these men or their businesses, with an aggregate balance outstanding on July 2, 1984, of $399,287.03. By this he was hardly on notice he should not do business with these men. Even after July 2, Gray insists he thought the risks reasonable and, where unsecured, backed by adequate financial statements. Reports of these loans, their terms, and periodic status were routinely available to "Clarksdale," which offered nothing but praise until a state bank examiner's probe in January, 1985.
These are not irrelevancies. They are evidence that Gray may have acted with reasonable business judgment. Most assuredly, the duty of care holds no truck with Monday morning quarterbacking, and the business judgment rule stands to prevent this. A loan officer is no guarantor of the success of each credit extension. By no means should anything said here be taken to suggest he has personal exposure every time a loan proves uncollectible. The prudence of the practice is judged objectively in the circumstances then existing and reasonably knowable by the officer. Principles of Corporate Governance, § 4.01(c); Miss. Code Ann. § 79-4-8.42 (rev. 1989).
The defense ultimately founders. The Chancery Court abundantly found the facts against Gray on the critical issues and from there impliedly found unreasonable Gray's belief regarding the extent to which he should have informed himself at the time regarding these debtors. Further, the Court impliedly found there was no rational basis for a belief that his handling of each of these matters was in USB's best interest. Each of these implied findings is more than supported by substantial evidence in the record.

2. Negligence of Gray's Superior Officers
Undaunted, Gray presses us that the losses in issue were caused or contributed to by USB's senior management.
If Gray was negligent, so too were his superiors who acted or failed to act on behalf of USB. If Gray was reckless, so were these experienced executives and directors for USB.
A major factual premise of the point is that Gray was an unsuspecting underling whom USB placed in a position beyond his abilities. As he puts it in his brief:
On July 2, 1984, at 35 years of age, Gray was placed in charge of the USB branch bank at Olive Branch acquired by it from [BOM] on that date... . At the time, he was the youngest of the branch managers in any of the ten branches in the USB system. While a college graduate, he had majored in accounting. He had one Freshman course in Banking. Unlike other managers of USB banks, he had not attended or graduated from the three-year Louisiana State University School of Banking. At the time he was placed in charge of Olive Branch by USB, he had approximately two years of bank lending experience, while other USB branch managers had on average some eighteen years of experience, all with *89 USB. Most of the work experience of Gray after leaving college was in the bank accounting area which did not involve the making or assessing of the quality of bank loans.
We find this theme trailing along on practically every page thereafter. Gray goes on to charge he was negligently supervised by USB senior executives, and that his prior experience and the conduct of his seniors with USB led him to think he was doing fine in his post-July 2, 1984, capacity.
The premise is fundamentally flawed. The duty of care the law devolves upon a corporate officer states an objective standard general in scope. Offenses may not be excused by any alleged inexperience or lack of skill and training as a loan officer. 3A Fletcher, Cyclopedia of Corporations, § 1060, p. 1061, (1986 Rev.); 18B Am.Jur.2d, Corporations, § 1727, p. 580 (1985). Nor does it matter Gray's offenses occurred during the early days of his new service, before USB's ninety-day probationary period had expired. The law of corporate governance provides no incompetence defense to officers called to account on their duty of care. Perhaps the notion may be captured in the phrase "assumption of risk." One who seeks corporate office assumes the risk he may not be up to the job. The law does not allow that a person may seek and accept corporate office and, upon charge of default, plead he was not qualified for the job and that the corporation should never have hired him in the first place.
Gray charges that senior vice president Edward P. Peacock, III, had oversight responsibilities for the Branch and was substantially neglectful in that regard. He points particularly to the $300,000.00 letter of credit issued for the benefit of Piecara's Mirage Construction in July of 1984. Gray did discuss the matter with Peacock, and it appears uncontradicted each used his $150,000.00 loan authority to issue the letter of credit. The same obtains with the Bigelow and LK & R credits. Gray reminds us the details of these credits were a part of the Branch's open records and reports which were surely read and approved by "Clarksdale." This may be so, but it may not belie the fact that Gray was the officer who initiated these credits, was most familiar with their details, and without whose sanction no funds would have been released. The short answer is, it is no defense to the charge that Gray breached his duty of care owed USB in this and other matters, that Peacock or someone else may also have breached a duty owed USB.[9] Nor is there a contributory negligence defense to a corporate officer's breach of the duty of care.
Neither may he defend on grounds other officers with superior authority negligently failed to detect or deter his defaults. This is not a case where a superior officer ordered Gray to extend the bad credits that have spawned this suit. It is not even a case  with one exception  where he claims his superior knew or should have known what he was doing before the fact and did not stop him. If we understand his plea, Gray is saying, after the fact, his superiors knew or should have known of the loans he was making and didn't criticize him. But by then the horse was gone. Within Gray's first six weeks of service as USB's Branch president, "most of the damage was done."

3. USB's Imprudent Collection Efforts
Gray's defense has a further dimension. Gray urges the evidence shows after his departure, USB was seriously neglectful in its management of the LK & R loans and, had it prudently pursued Messrs. Lowery, Kantor and Riggan, USB could have effected a much greater recovery on its notes. Gray points to $6,004,600.00 combined net worth of LK & R as reflected on their 1984 *90 financial statements. Lowery is said to have a steady $100,000.00 annual salary, a portion of which was surely available. Riggan is supposed to have had an equity in an interest in 1718 acres of farmland in Tunica County. Gray says USB missed a chance to get a deed of trust on this land and, more generally, let all of the LK & R assets slip away by not suing on the notes and obtaining and enrolling lien-generating judgments.
USB retorts this is so much fancy. Suits and judgments would only have forced Lowery and Riggan into bankruptcy. Besides, Gray made no credible proof there were assets of consequence a judgment lien might have seized. USB says its patience in working with Lowery and Riggan resulted in a $130,000.00 plus recovery that would otherwise have been lost, though this was applied to other, older debts. More generally, USB sounds a lot like Gray when it says it made a reasonable business judgment how it ought pursue collection and that judgment ought not now be second guessed.
The Chancery Court heard this evidence and held Gray's defaults the sole proximate cause of the losses endured. Though USB's post-Gray collection strategy is not given express mention, we have here a circumstance for implied findings. We may from this record infer with confidence the Court below thought USB had made reasonable collection efforts and this is all the law asks.

C. Gray's Duty of Loyalty
Officers such as Gray owe a second duty to the corporation they serve, a multi-faceted duty of loyalty, of good faith, a central sphere of which has been recently renamed the duty of fair dealing. Principles of Corporate Governance, § 5.01. See also, Derouen v. Murray, supra; Hill v. Southeastern Floor Covering Company, Inc., 596 So.2d 874, 877 (Miss. 1992); Fought v. Morris, 543 So.2d 167, 171 (Miss. 1989); Ellzey v. Fyr-Pruf, Inc., 376 So.2d 1328, 1332 (Miss. 1979); Cooper v. Mississippi Land Co., 220 So.2d 302 (Miss. 1969); Knox Glass Bottle Co. v. Underwood, 228 Miss. 699, 89 So.2d 799 (1956). This duty is fiduciary in nature, by reason of which the officer is "held to something stricter than the morals of the market place." Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928). The duty obtains most directly when the officer is interested personally in a matter affecting the corporation. The concept of interest is broadly defined and includes cases where the officer has a relationship with a party to the transaction that may reasonably be expected to affect the officer's judgment or is subject to the influence and domination of such a party. See Principles of Corporate Governance, § 1.23(a). Yet the duty goes beyond this and is coextensive with the legitimate, enduring interests of the corporation. Loyalty to those interests is the corporation's due.
The duty of loyalty takes no canonical form. It is as complex as corporate interests and officer temptations and means of descent from grace. It partakes of the objective as well as the subjective. If, for example, an officer neglects the substantial interests of his corporate principal by preferring another in a matter of importance, the officer may well offend his duty of loyalty though his heart be pure. In such a case we would not concern ourselves with the officer's subjective intent but with the content of his conduct reasonably viewed by objective third persons. We would ask whether there be a rational basis for a belief his action was in the entity's best interest and not whether in fact he held such a belief.
As members of the human race and participants in original sin, corporate officers at times consciously pursue the interests of self and others to the neglect of their principal. They may seize opportunities for profit they know belong to their corporations. At other times they steal and embezzle and defraud the corporations they serve, and so their malignant mind becomes our central focus; hence, the subjective side of the duty of loyalty. We need not search here for subjective breach. In the USB-drafted findings of fact, the Chancery Court found there was

*91 no evidence in this case that Mr. Gray's conduct was in any way the result of fraud, dishonesty, or similar misconduct, ... .
USB makes no charge Gray has perpetrated a fraud. It concedes Gray has received no
payment to him personally or other personal benefit arising or growing out of loans and other transactions during the time he was employed by USB.
This is tantamount to a finding Gray was not interested in the several credits for which he is called to account. Gray's case is not within the newly-refined duty of fair dealing but is subject rather to the older, admittedly more amorphous duty of loyalty, objective variety.
What the Court does say is, the source of Gray's sin lay in his "divided loyalties in breach of his fiduciary duty to USB." To be sure, for some five months Gray acted for BOM and USB with the full knowledge and acquiescence of each. That period of dual devotion ended July 2, 1984. Much is said in the USB-drafted findings, and in the briefs of the parties, of pre-July 2 matters, of Gray's handling of the LK & R and Bigelow matters prior to July 2, 1984. This is but background. Gray's present and only offense is that, once he became an officer of USB, he neglected the interests of USB and favored those of BOM. And so the Court below held "Gray violated his fiduciary duty ... in the Bigelow and LK & R transactions by ... acting with divided loyalties."
One feature of the holding below seems off base. The Court found Gray "violated his fiduciary duty in the Piecara transactions by exceeding his authority both as to the amounts involved and inadequate and unperfected security for such advances." The Court faulted Gray as well in the Bigelow and LK & R transactions for "exceeding his [loan] authority." These offenses import primarily the duty of care, not the duty of loyalty. A bank officer extending credit in excess of his loan authority or without adequate security may well act in complete and disinterested good faith, and in the belief that he is furthering the interests of the bank. This is not to say there may not be some level of excess that may, objectively viewed, offend the duty of loyalty. On today's record, these findings support the view that Gray violated his duty of care, but that is all.
A part of an officer's duty of loyalty requires that he protect the corporation's property. That he may not appropriate corporate assets to his own use seems apparent. And the same of corporate opportunities. It is equally an offense that he gives that property away to the poor, to the church, to charity. However worthy in other settings, altruism has little role within the officer's duty of loyalty, at least absent full disclosure and formal authorization. And so when Gray on July 23, 1984  gratuitously, if you will  took USB's $407,210.96 and gave it to BOM (to the credit of LK & R), he breached his duty of loyalty to USB. Similarly, when Gray expended USB's funds for Bigelow to pay Heller and on January 13, 1985, issued USB's letter of credit to prevent Heller's calling the BOM letter before it expired, he breached his duty of loyalty to USB. Whether these actions evince a (disinterested) loyalty to BOM is not important. There is substantial evidence supporting the crudely put holding Gray breached his duty of loyalty to USB in the sense that no loan officer could rationally believe Gray's handling of these matters was in USB's best interest.[10]
These things said, we may only affirm the judgment in favor of USB and against Gray.

Omnibank of Mantee's (BOM's) Appeal

VI. HEREIN OF THE DIFFERENCE BETWEEN MERE ENRICHMENTS AND UNJUST ENRICHMENTS
The Piecara loans originated entirely post-July 2, 1984. The LK & R and Bigelow credits had a BOM history, and USB seizes on this to sue BOM, sensing perhaps that Gray may not respond. USB *92 succeeded below, as the Chancery Court held BOM liable jointly and severally with James Gray for losses emanating from the LK & R and Bigelow matters. The Court's supporting legal theory was unjust enrichment or quasi-contract. The Court found:
As a proximate result of Gray's transactions with Lowery, Riggan and Kantor and the Walter Heller/Bigelow letter of credit, ... [BOM] was unjustly enriched.
BOM vigorously dissents. Assuming arguendo Gray's actions were improper, BOM denies it was in any way responsible for those actions, and the mere fact just debts owed it may have been paid, without more, does not make its enrichment unjust. USB retorts BOM was indeed unjustly enriched and that the judgment below may stand (1) if BOM gave no value for benefits USB/Gray conferred upon it, or (2) if BOM knew or should have known that Gray was breaching his fiduciary duty to USB.
Unjust enrichment is the sovereign's acceptance of first principles of external morality into its corporate law. It is a legal principle that makes sense only in a state respecting private property and a capitalistic economy. It is a creature of equity closely associated with "implied contracts," quasi-contracts and trusts. Estate of Johnson v. Adkins, 513 So.2d 922 (Miss. 1987). It imports a standard easy to state but difficult to apply, no doubt because of its generality near to abstraction. In Hans v. Hans, 482 So.2d 1117 (Miss. 1986), for example, we said:
The doctrine of unjust enrichment or recovery in quasi-contract applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another, the courts imposing a duty to refund the money or the use value of the property to the person to whom in good conscience it sought to belong.
Hans, 482 So.2d at 1122. To like effect are statements in Koval v. Koval, 576 So.2d 134, 136-137 (Miss. 1991); Magnolia Federal Savings & Loan v. Randal Craft Realty Co., 342 So.2d 1308 (Miss. 1977); and Old Men's Home, Inc. v. Lee's Estate, 191 Miss. 669, 2 So.2d 791 (1941), among others.
A person is enriched when he receives an economic benefit. This includes positive profits, a loss avoided, as well as discharge of debts. What is important and what careless readers often fail to remember is our law accepts no value condemning pursuit of wealth, so long as it be done within legal parameters. There is nothing inherently unjust about enrichment. The principle does not proscribe mere enrichments, only those objectively seen as unjust. For example, a lender may hold a debtor's legally enforceable note, having given value for the promise to pay. But where one's debtor or someone acting in his interest procures payment of the just debt, the creditor may accept and ordinarily keep that payment without giving further value, for we see no injustice in his doing so.
The Restatement of Restitution, which has been cited with approval by this Court,[11] provides, if payment is made, even by mistake, to a creditor of a third person to satisfy a just debt of that third person, the payor has no right of restitution of or from the third party. Restatement of Restitution § 14(1) (1936). Accord, United States v. Bedford Associates, 713 F.2d 895, 905 (2nd Cir.1983), Equilease Corp. v. Hentz, 634 F.2d 850, 853 (5th Cir.1981), and Strubbe v. Sonnenschein, 299 F.2d 185, 191-92 (2nd Cir.1962). To be sure, this is not so if the third person has procured the mistake or participated in or caused a breach of some duty imposed in law, but where nothing like this has happened, the enrichment is not unjust and the payor must instead look to the party whose debt has been paid, through subrogation or some such theory.
The principle may be stated otherwise. The mere fact that a third person  here BOM  benefits from an arrangement between two other persons  USB and LK *93 & R and USB and Bigelow  does not make such third person liable in quasi contract, unjust enrichment, or restitution. Moreover, where a third person benefits from an agreement  here a loan agreement  entered into between two other persons, in the absence of some misleading or wrongful act by the third person, the mere failure of performance by one of the contracting parties (LK & R and Bigelow) does not give rise to a right of restitution against the third person (BOM). In other words, a person who has conferred a benefit on another, by making a contract with a third person, is not entitled to restitution from the other merely because of the failure of performance by the third person. Restatement of Restitution § 14(1) (1936); 66 Am.Jur.2d Restitution and Implied Contracts, § 16, at 960 (1973).

VII. OF VALUE, CONSIDERATION AND QUIDS PRO QUO

A. Lowery, Kantor and Riggan
In the USB-drafted findings of fact and conclusions of law, the Court first holds
[BOM] is liable to make restitution even if ... [BOM] took USB's money without notice of Gray's breach of fiduciary duty, so long as ... [BOM] advance no "consideration" for Gray's substitution of notes. The Court finds no quid pro quo, or equity to support ... [BOM's] claim to the LR & K money.
The holding denies any necessity of a finding BOM has participated in or had prior knowledge of any of Gray's wrongdoing.
In the real world of banks that do business as banks and compete with one another, it is not uncommon that an individual or business entity may use one bank for a time and, for whatever reason, decide a more advantageous arrangement can be found elsewhere. In such circumstances, the customer may often obtain an extension of credit from his new bank and thereupon satisfy debts due his old bank. What bank officer has not had the experience of receiving a call from someone with another bank, stating, "I need to get the payoff amount on your John Doe loan." At times no doubt this happens after the old bank has made the credit judgment that the John Doe loan has become a bit shaky and has decided to extend Doe no further credit. This may have been the reason Doe sought a new bank, and it is hardly an occurrence bankers would label bizarre that a new bank is willing to take on Doe as a borrower even though the old bank has had its fill of him. We think it fair to suggest there are even times when Doe's old bank has for some while been thinking, "We don't know how in the world we are ever going to get our money out of Doe," when, out of the blue, a new bank Doe has seduced advises a payoff is on the way. Subsequent chapters in such scenarios sometimes find the new bank less than pleased with its new customer. There are times when the customer defaults, so that the new bank must resort to collateral or pursue collection. And when this happens, think how silly it would seem if the new bank should sue the old bank to recover the original payoff sum and hold the old bank liable because it had given no consideration for the payoff. The old bank in such a scenario had no doubt been enriched, but no sensible person would label that enrichment unjust.
That circumstance is analogous in every legally relevant way to the point USB presses today. BOM gave value  consideration  for the June 26, 1984, LK & R note it held, some $400,000.00 worth of value. LK & R gave value to BOM on July 23 when Gray wired the funds to BOM's correspondent paying LK & R's note. BOM gave value for the $407,210.96 it received on July 23 when, in the Chancery Court's words, it "treated the $400,000.00 note as satisfied." USB received value for its $450,000.00 in the way banks customarily receive value for monies disbursed when it received LK & R's three cross-guaranteed interest bearing notes dated July 27, 1984. This is the way the banking world works. That there may have been a substantial credit risk inherent in the promises the LK & R-to-USB notes reflected did not strip these of their power to vest in USB certain legally enforceable obligations of and from LK & R, obligations USB has pursued, albeit prudently and with but modest effect. *94 We doubt USB would find offense had USB/Gray in July of 1984 taken the LK & R notes and handed LK & R a check for loan proceeds, which LK & R in turn deposited and then drew their check to BOM for principal and interest then due. We perceive no difference in legal effect that Gray transferred the funds by wire from USB's Memphis correspondent to BOM's Memphis correspondent.
It is important to remember that "a transfer of property ... in satisfaction of ... a pre-existing debt ... is a transfer for value." Restatement of Restitution, § 173(2) (1936). This is an accepted principle in many areas of the law. Cf. Miss. Code Ann. §§ 75-3-303(b) and -408 (1972). None would think a debtor's payment of his (past due) note recoverable for want of value. It is all the same when the antecedent debt is paid with proceeds of a loan from another lender. Besides, upon receipt of USB's wire, BOM gave up all rights against LK & R as conferred by their note, including fourteen percent per annum interest.[12]
USB repeatedly insists we ignore all of this and isolate our thoughts to but a lone convergence in space-time on July 23, 1984, when Gray wired its money to BOM. The point escapes us. Assuming BOM and USB had bargained for the sale of the LK & R note, the form of value given by BOM would surely have been sale of the LK & R note to USB. To be sure, a prudent negotiator for USB would have bought the note only at a substantial discount, but this does not change the form or adequacy of the value BOM would give. That BOM may have received more than fair market value does not leave the bargain legally suspect. USB seems to be saying BOM should have offered to pay USB for taking the note. In point of fact, USB took the three cross-guaranteed interest bearing notes from LK & R, which in substance is the only form of value we can imagine it might have received from BOM. It was value received adequate in law, notwithstanding it may have been inadequate in fact. BOM has been enriched but not unjustly so.

B. Bigelow
Nor was BOM unjustly enriched in the Bigelow matter. The evidence is simpler. USB does not contend BOM did anything that induced Gray to make the USB-Bigelow loans or issue to Heller the new letter of credit in January of 1985. The Court below found "there was no proof that [BOM] ... knew that Gray would substitute the letters of credit." USB makes no claim it may impute to BOM Gray's breach of duties owed USB in the Fall of 1984 and early winter days that followed.
As with LK & R, USB argues BOM must be held because it received no consideration for its January, 1985, "release" from its letter of credit held by Heller. USB misconceives the Bigelow matter as it did the LK & R matter. BOM had given Heller the $100,000.00 letter of credit for Bigelow's benefit on January 23, 1984. The letter by its terms was good for one year. Heller never presented the letter and demanded BOM honor it. Gray feared Heller might and so made Bigelow the several USB loans and issued the new USB letter of credit on January 11, 1985. BOM knew nothing of this. USB's consideration was Bigelow's obligation to indemnify USB if USB had to honor the letter of credit and pay Heller. That USB via the neglect of Gray extended a credit that took BOM off the hook imposes no duty upon BOM to indemnify USB because Bigelow ultimately defaulted. Bigelow may have been shaky when all of this was done, but this is of no consequence, nor is the fact he ultimately took bankruptcy. USB's loss on this record emanates from Gray's breach of his duty of care and Bigelow's insolvency, but nothing in these renders in any way unjust BOM's undeniable enrichment.

VIII. BOM'S (LACK OF) PARTICIPATION IN GRAY'S BREACH OF DUTY OF LOYALTY: IN RE LK & R ONLY
USB ultimately argues, at least in the LK & R matter, BOM had a knowing *95 participation in Gray's breach of his duty of loyalty. We are told BOM took more than a fair advantage of the faith USB placed in Gray. The USB-drafted findings include
[BOM] ... through its Chairman of the Board, Woodrow Martin, by his silence colluded with Gray to his breach of fiduciary duty to USB.
The reason this is so is BOM knew Gray was considering paying the LK & R note with a new USB loan and
[BOM] ... knew that the only way Gray could take .. . [BOM] off the LK & R risk was to breach his fiduciary duty of loyalty to USB.
USB stretches the finding and insists Martin and Ishee and BOM knew the only way Gray could manage to get BOM paid was to make LK & R a new USB loan, and there was no way Gray could do this without breaching his duty of loyalty to USB.
Without doubt, BOM on June 26, 1984, held a valid and enforceable note from LK & R. BOM had no choice but to honor the letter of credit when First South presented it on June 5, and we find no consequence in the fact BOM did not evidence the debt by an LK & R note for some three weeks. The question is what BOM knew then and did thereafter, whether BOM was involved albeit passively in the forbidden features of Gray's July 23 decision to make LK & R a new USB loan and thus pay in full the June 26 note BOM held from LK & R. A corporation may ordinarily be taken to know what its officers know. Parmes v. Illinois Central Gulf Railroad, 440 So.2d 261, 265 (Miss. 1983); 18B Am.Jur.2d, Corporations, § 1671, 1675. Board Chairman Woodrow W. Martin, Jr., President Jerry Ishee, and Director/Branch President Gray were the only BOM officers who knew anything of the June 26 LK & R note and its aftermath. Ishee's knowledge is all post-July 2.
We know Gray told Martin of the facts and figures of the LK & R matter at a BOM Board meeting on June 27, 1984. Martin became concerned about the risks BOM faced, and Gray readily saw this. Gray advised Martin in good faith he expected LK & R to pay the note shortly. Gray told Martin that, if this did not happen, Gray would "take ... [BOM] out of the risk" by making LK & R a new loan through USB, which would enable them to pay BOM. Martin told Gray to "work it out." Gray well knew, prior to his June 30, 1984, resignation as an officer and director of BOM, that it just might take a new USB loan to get BOM's note paid within the near future. Post-July 2, 1984, Ishee admits he was expecting Gray would "take care of the matter" though he never talked to Gray about it. It is fairly inferrable that Gray considered he had gotten BOM into the LK & R risk, and it was his responsibility to get his old bank out of it.
We have read and reread the Gray testimony. We impute to BOM everything Gray knew on or before June 30, 1984, and everything Martin and Ishee knew at any time. We find nothing supporting the sweeping conclusory findings of collusion[13] and BOM participation in Gray's breach of his duty of loyalty to USB. There is no evidence of BOM-USB contact or communication about the matter after July 2, 1984. The mere fact BOM knew it had a risky loan and that Gray had represented he would likely make a USB loan to pay BOM does not import collusion or other improper conduct. BOM had no reason to know or expect Gray would make the USB-LK & R loan without complying fully with USB's internal loan policies. Nothing before us charged BOM with knowledge Gray would exceed his USB lending limits. Gray had been serving two masters for five months, protecting the interests of each without compromising the interests of the other. Nothing suggests BOM had reason to know or expect Gray would neglect his duty of loyalty to USB any more than he had since February of 1984.
We have held Gray on July 23, 1984, breached his duties of care and loyalty, but neither breach was intentional, as the findings *96 of no fraud, dishonesty or profit make clear. If Gray's conduct was not purposefully wrongful, an inference BOM colluded with him becomes far fetched. Just because BOM had reason to expect Gray would see that BOM suffered no loss is no basis for inferring Gray would do so improperly.
Still, USB insists BOM knew there was no way Gray could have made the USB loan to LK & R, paying BOM's note, without breaching his duty of loyalty to USB. But that won't wash. Gray could have made the new LK & R loan the same way he handled the Piecara letter of credit (which may still have breached his duty of care). He could have called Senior Vice President Peacock or some other senior officer in Clarksdale and obtained approval. It is certainly possible, in law and in fact, consent would have been given. We know that USB had expressly assumed other BOM unsecured loans to Lowery and Riggan and their associates, and in substantial sums. There is no evidence USB rejected the (pre-June 5, 1984) BOM letter of credit to First South on ground it considered Lowery and Riggan a pook risk. USB decided to decline contingent liabilities across the board, and this happened to include the First South/LK & R letter of credit. Besides, USB knew these men. They had on file financial statements on their face reflecting an aggregate net worth in excess of $6,000,000.00. No one in USB besides Gray knew of their eight figure loan guarantees on the Belvedere and Wagner Place properties. USB's main office in Clarksdale had made prior loans to Kantor and Riggan. Kantor is from Clarksdale. Riggan had in-laws from Clarksdale. As late as January of 1985, when the USB-LK & R loan had been criticized by state bank examiners, CEO C. Willis Connell, Jr., informed USB's loan committee he believed the LK & R notes would be paid. USB made a new $70,000.00 loan to Riggan as late as July 11, 1988, albeit with two co-makers and security.
In July of 1984, Gray acting for USB certainly could in law have made the BOM-satisfying loan without breaching his duty of loyalty, and it is not beyond the realm of possibility Clarksdale may have granted the requisite approvals. It was not a fact that the only way Gray could take BOM off the LK & R risk was to breach his duty of loyalty to USB, and, if it was not, BOM may hardly be charged with knowing the unknowable. This USB-worded conclusory fact fails flatly and deflates the entire collusion theory. So seen BOM's July 23 enrichment is hardly unjust. The evidence before us, considered most favorably to USB but without speculation or wishful thinking, meets no refinement of unjust enrichment USB has cited or that we have been able to find on independent research.
BOM is not required to disgorge the $407,210.96 it received from USB on July 23, 1984, in satisfaction of the LK & R note on grounds it gave no consideration therefor. Similarly, BOM is not required to repay USB $100,000.00 because Gray, acting for USB in January of 1985, issued a new $100,000.00 letter of credit to Walter E. Heller & Company for the benefit of Jess Bigelow.

Omnibank of Mantee's (BOM's) Contingent Appeal

IX.
In the Chancery Court, BOM filed a cross-claim against Gray and a third party complaint against Lowery, Kantor and Riggan. The substance of these claims was an effort to recoup any sums BOM may be held to owe USB. The Chancery Court refused BOM judgment on its cross-claim and on its third party claims, and BOM appealed.
In view of the disposition we make of BOM's appeal of USB's judgment against it, BOM's contingent appeal of the Chancery Court's denial of its cross-claim and its third party claims appears moot and is dismissed as such.
ON APPEAL OF JAMES R. GRAY V. UNITED SOUTHERN BANK, AFFIRMED; ON APPEAL OF OMNIBANK OF MANTEE V. UNITED SOUTHERN BANK, REVERSED AND RENDERED; ON APPEAL OF OMNIBANK OF MANTEE V. JAMES R. GRAY, JOHN B. LOWERY, PHILLIP KANTOR, AND *97 CHARLES S. RIGGAN, DISMISSED AS MOOT.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, SULLIVAN, PITTMAN and BANKS, JJ., concur.
McRAE, J., dissents without written opinion.
HAWKINS, P.J., not participating.
NOTES
[1] Martin did not testify at the trial. We know from other sources he died of a self-inflicted gunshot wound on June 29, 1986. See Martin v. Estate of Martin, 599 So.2d 966, 968 (Miss. 1992).
[2] The balance took the form of a commercial loan to "JBL and Merrie Olds." Riggan owned an automobile dealership in Collierville, Tennessee, and thought he could enhance its value if he owned an adjacent parcel of land. Inexplicably, Gray did not require that Riggan give a (purchase money) deed of trust on the purchased parcel.
[3] Gray had consulted higher authority within BOM and had been instructed not to issue the Bigelow letter of credit until Bigelow had provided security in the form of a $100,000.00 certificate of deposit. Gray did not do this. In its argument on appeal, USB is quite critical of Gray for this lapse, and, as well, for his said-to-be-defaults in duties owed BOM in the LK & R matter. We are never told, nor do we see, how Gray's failures as a BOM officer may bear on any issue regarding USB's claim against Gray or its claim against BOM.
[4] On another front, USB is engaged in litigation with American Casualty Company, said to have written directors' and officers' liability coverage protecting USB against losses such as those with which we are here concerned. See American Casualty Company v. United Southern Bank, 950 F.2d 250 (5th Cir.1992). Though we note the fact, it does not affect the present proceedings.
[5] Initially Gray and BOM pressed the premise but without record support. The parties have now supplemented the record, and we have compared the Findings of Fact and Conclusions of Law approved by the Chancery Court on February 21, 1989, with those USB submitted. They are the same. To confirm the point, we inquired of USB's counsel at argument, and he concurred:

In all material respects, the first page had been retyped and I've not looked to see exactly what was retyped, but in all material respects, that was our proposed findings.
[6] As in other settings we may not abdicate judicial responsibility for assessing the reasonableness of any custom pled in defense. Customs may not subsume legal standards, only inform them. George B. Gilmore Company v. Garrett, 582 So.2d 387, 394-96 (Miss. 1991); Hall v. Hilbun, 466 So.2d 856, 872 (Miss. 1985).
[7] "Reckless" is recklessly tossed about of late. USB seizes on this word it inserted in the Court's findings, and we find it on almost every page of Brief of Appellee. The term is not helpful. It is unnecessary to state the duty of care. It is a grossly inadequate expression of our standard for punitive damages, see, Weems v. American Security Insurance Co., 486 So.2d 1222, 1225-26 (Miss. 1986), and progeny, e.g.; Whittington v. Whittington, 535 So.2d 573, 583 (Miss. 1988); Aetna Casualty & Surety Co. v. Day, 487 So.2d 830, 832 (Miss. 1986), and, in lieu thereof, attorneys fees. We say nothing further for Gray has not appealed this issue. Rule 28(a)(3), Miss.Sup.Ct.Rules.
[8] Prior to 1978, contract rights enjoyed special and distinct recognition within the Secured Transactions Article of the Uniform Commercial Code. See Miss. Laws, ch. 316, §§ 9-102(1)(b) and 9-106 (1966); codified originally as Miss. Code Ann. §§ 41A:9-102(1)(b) and 9-106 (1942 Recompiled). In 1972, the National Conference of Commissioners of Uniform State Laws and the American Law Institute, co-guardians of the UCC, amended the official text to delete references to contract rights and to coalesce the concept into "accounts." 3 U.L.A., Uniform Commercial Code § 9-106, Official Reasons for 1972 Change, and Notes of Decisions (1981 and 1992 Cum.Supp.); Miss. Laws, ch. 452, §§ 5, 9 (1977), codified as Miss. Code Ann. § 75-9-102(1)(b) and -9-106 (1981 Rev.).
[9] The Chancery Court found that USB's senior Clarksdale officers were not negligent, or, alternatively, any neglect by them did not cause the losses at issue. These findings are particularly suspect, see Part III above, as they were drafted by counsel answerable to the same senior executives the findings exonerate. We need not pursue the point, as we hold the neglect of co-officers may not serve to exonerate a bank officer who has breached his duty of care and caused loss.
[10] Quite apparently, here lies a point of intersection between the duties of care and loyalty. The objective duty of loyalty extends to much more than loss-causing breaches like today's and includes such doctrines as corporate opportunity.
[11] This Court has often cited the Restatement of Restitution. See, e.g., Dudley v. Light, 586 So.2d 155, 159 (Miss. 1991), citing and quoting from Neyland v. Neyland, 482 So.2d 228, 230 (Miss. 1986); Fourth Davis Island Land Co. v. Parker, 469 So.2d 516, 524 (Miss. 1985).
[12] There is a minor brouhaha in the record about whether BOM physically marked the LK & R note cancelled in July of 1984. Suffice it to say nothing of consequence turns on the (non)performance of any such formality.
[13] At oral argument USB's counsel conceded "collusion" an over-description. "Agreement," we are now told, is a better term.